METRO NATIONAL CORPORATION, MEMORIAL CITY HOSPITAL CORPORATION, METROPOLITAN SECURITY COMPANY, INC., AND SPRING SHADOWS SALES COMPANY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Metro Nat'l Corp. v. Comm'r
Docket No. 33279-84. United States Tax Court
T.C. Memo 1987-38; 1987 Tax Ct. Memo LEXIS 38; 52 T.C.M. (CCH) 1440; T.C.M. (RIA) 87038; January 20, 1987. *38 Held: On the facts, movable gypsum drywall partitions, "storefront" corridor partitions, cabinets, and decorative and security lighting are not structural components of a building and are thus "section 38 property" eligible for the investment tax credit for 1981. Held further: On the facts, "storefront" walls between an atrium and offices, false ceiling and lay-in lighting fixtures, and lawn sprinkler heads are structural components of a building or of an inherently permanent structure, not "section 38 property," and, therefore, do not qualify for the investment tax credit for 1981. David D. Aughtry and Linda S. Paine, for the petitioners. William G. Bissell and Thomas G. Norman, for the respondent. FEATHERSTON
*39 MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year Ended
Deficiency
March 31, 1978
$ 70,699
March 31, 1979
$253,648
March 31, 1980
$ 38,404
The issue to be decided is whether petitioners are entitled to an investment tax credit under section 38 [1] with respect to the following items placed in use in two buildings owned and rented to tenants by petitioners: (1) Partitions, including gypsum wall, storefront, and toilet partitions. (2) False ceilings, grids, and lay-in lighting facilities. (3) Exterior security lighting, grow lights, and accent decorative lighting. (4) Cabinets, laminated plastics, and cabinet hardware. (5) Sprinkler *40 heads. For convenience, we shall state some general findings of fact and general legal principles applicable to all items in dispute and shall then combine the more precise facts and the legal discussion with respect to each item. GENERAL FINDINGS OF FACT Metro National Corporation (petitioner or Metro) is the parent under section 1504(a) of an affiliated group of includable corporations which are the petitioners in this proceeding. Metro's principal place of business at the time the petition was filed was in Houston, Texas.Consolidated corporate income tax returns for the years in controversy were filed with the Internal Revenue Service Center, Austin, Texas. Metro was formed by Joe Johnson who started his career as a plumbing subcontractor in residential sections in the Houston area. In the mid-1950's he began developing apartment complexes in the Houston suburbs and later built a large shooping center, the largest enclosed shopping mall in the Southwest. In the late 1960's, Johnson saw the need for a medical center in a suburb, Memorial City, and through Metro *41 constructed the Memorial City Professional Building (Pro I) and Memorial City General Hospital (the hospital). Metro later developed two office buildings as well as apartments, homes, townhouses, and a third professional building. As the population increased, the professional building was remodeled and the hospital was expanded over a period of years. The interior walls of Pro I were constructed with 2" X 4" wooden studs covered by gypsum board, were not movable or reusable, and thus did not provide flexibility for changes in the configuration of the interior space. In 1979 and 1980, Metro began design and construction work on two new buildings: Memorial Professional Building II (Pro II), a 3-story building with an atrium in the center which extends to the roof, located across the street from the hospital, and Spring Shadows Glen (the Glen), a psychiatric treatment facility, located at 2801 Gessner in Houston. Both of these buildings were completed in 1981. Based on Metro's experience in providing medical facilities space, these new buildings were so designed as to provide maximum flexibility in the configuration and arrangements for office and other space. Both buildings *42 were designed on modular plans which permitted easy access to plumbing, heating, air-conditioning, ventilation, and electricity. Pro II was designed with 25' modular centers which provide support for the building structure. The heating, ventilating, air-conditioning, and electrical lines run through chases located in the support columns and thereby facilitate access and interior space configuration. Pro II, designed for lease to doctors and dentists, was not pre-leased before it was built. The architectural plans for the building did not include the partitions. The interior space was typically not completed until a tenant leased the space and designated his or her floorplan. At the time the space was leased, Metro itself, a general contractor, or a subcontractor built out the space to the tenant's specifications. Bookcases, storage, and other cabinets specified by the tenant were constructed in Metro's workshop. Partitions, window coverings, floor coverings, ceilings, and lighting were installed as designated by the tenant. Partitions, ceilings, and lighting in the Glen are similar to those used in Pro II. GENERAL LEGAL PRINCIPLES The Court is called upon to decide whether *43 five categories of assets (listed in the statement of the issues presented for decision, above) are "section 38 property" qualifying for the investment tax credit. Section 48(a)(1)(A) [2] defines section 38 property to include, among other items, "tangible personal property," but does not define that elusive term. Section 1.48-1(c), Income Tax Regs., explains that "the fact that under local law property is held to be personal property or tangible property" does not control the decision whether the property constitutes tangible personal property. Rather the term is given a special meaning tailored to the purposes of the investment tax credit provisions. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 415-416. [3]
*44 In S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 722, it is stated: Tangible personal property is not intended to be defined narrowly here, nor to necessarily follow the rules of State law. It is intended that assets accessory to a business such as grocery store counters, printing presses, individual air-conditioning units, etc., even though fixtures under local law, are to qualify for the credit. * * * The regulations (sec. 1.48-1(c), Income Tax Regs.) contain the following definition of "tangible personal property:" For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). * * * Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. * * * In the instant case, we are not dealing with the allowability of the credit for "land and improvements thereto, such as buildings or other inherently permanent structures" as used in the *45 parenthetical phrase of the foregoing regulation. No claim was made for an investment tax credit for the inherently permanent structures of Pro II or the Glen. Rather, the issue we must decide is whether the items in dispute are "structural components of such buildings or structures." Section 1.48-1(e)(2), Income Tax Regs., explains the meaning of "structural components" mainly by illustration, rather than by definition, in pertinent part, as follows: The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; * * * plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; * * * sprinkler systems; * * * and other components relating to the operation or maintenance of a building. [4] * * * *46 Subsequent to the promulgation of this regulation, the Senate Finance Committee, in S. Rept. No. 95-1263 (1978), 1978-3 C.B. 321, 415, issued in respect of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2767, stated the following clarification of the congressional intent: In addition, the committee wishes to clarify present law by stating that tangible personal property already eligible for the investment tax credit includes special lighting (including lighting to illuminate the exterior of a building or store, but not lighting to illuminate parking areas), false balconies and other exterior ornamentation that have no more than an incidental relationship to the operation or maintenance of a building * * *. Similarly, * * * movable and removable partitions * * * are considered tangible personal property and not structural components. Consequently, under existing law, this property is already eligible for the investment tax credit. [5]
*47 Respondent argues that the issue of whether property is considered a structural component of a building is determined by the manner of attachment to the land and how permanently the property is designed to remain in place, citing Rev. Rul. 75-178, 1975-1 C.B. 9. Petitioners argue that the emphasis should be on movability, not manner of attachment, and argue that respondent's stress on manner of attachment and permanency calls for a rule based on State law personal versus real property concepts, which the regulation expressly states is "not controlling." Sec. 1.48-1(c), Income Tax Regs.
The test to be applied in determining whether the property items in issue are structural components of Metro's buildings is particularly important in this case because respondent contends that many of the facts cited by Metro to support its position based on the movability test are irrelevant. As we read the regulation (sec. 1.48-1(e)(2), Income Tax Regs.) it lists a number of illustrative items which in the ordinary case are structural components of a building and ends with a final element, which reads "and other components relating *48 to the operation and maintenance of a building." In Scott Paper Co. v. Commissioner,74 T.C. 137, 182-183 (1980), involving a claimed credit for electric wiring, the Court discussed the listed items and the above-quoted final element of the requlations as follows: Although we give great weight to respondent's regulations, it would be improper to read the words "electric wiring" in a vacuum and conclude that those electric cables, therefore, must be structural components. Rather, the effect of the final element of that same subparagraph, which reads "and other components relating to the operation or maintenance of a building," must be taken into account. That final element functions as a descriptive phrase intended to present the basic test used for identifying structural components. The preceding elements are examples of items which meet the test as a general rule. Items which occur in an unusual circumstance and do not relate to the operation or maintenance of a building should not be structural components despite being listed in section 1.48-1(e)(2), Income Tax Regs. * * * Accordingly, the critical test * * * is whether they [the *49 electric wiring and fixtures] relate to the overall operation and maintenance of a building. * * * [Fn. ref. omitted.] See also Everhart v. Commissioner,61 T.C. 328, 331 (1973); Ponderosa Mouldings, Inc. v. Commissioner,53 T.C. 92, 96 (1969). A common characteristic of the listed structural components such as walls, partitions, floors, ceilings, windows, doors, etc., and other components relating to the operation and maintenance of a building is reasonable permanency. In the ordinary case, a building is planned, designed, and constructed with the expectation that the items listed in the regulation will remain in place indefinitely. They are usually integrated with the building during the construction phase and are permanent parts of the building. They are not installed merely to meet the peculiar needs of a tenant. As a general rule, they relate to the operation or maintenance of a building and "cannot be removed or relocated without doing at least temporary damage to the building itself." King Radio Corp., Inc. v. United States,486 F.2d 1091, 1096 (10th Cir. 1973); see also Minot Federal Savings & Loan Association v. United States,435 F.2d 1368, 1369-1370 (8th Cir. 1970) *50 (removable partitions are section 38 property); Kramertown Company, Inc. v. Commissioner,488 F.2d 728, 731 (5th Cir. 1974), affg. a Memorandum Opinion of this Court (rooftop air-conditioning and heating units are not section 38 property). Thus, the permanency of a building component has been considered an important factor in determining whether it is a structural component. Petitioner's contention that movability is the controlling criterion cannot be sustained. We find no support in the statute, its legislative history, or the regulations for movability as the decisive test. To the contrary, in Everhart v. Commissioner,supra at 331, involving the issue whether a self-contained, prefabricated sewage disposal system was a structural component, the Court stated: "[W]e do not believe that movability per se determines whether property is personal or not." Similarly, in Kramertown Company, Inc. v. Commissioner, supra at 731, involving a rooftop air-conditioning and heating system, the court stated that the "quality of removability is not the sole determinant of whether a piece of machinery is a structural component." In fact, *51 some of the structural component items listed in the regulation (sec. 1.48-1(e)(2), Income Tax Regs.), such as paneling, tiling, windows, doors, etc., are often readily removable. Movability is only one characteristic to be considered in applying the permanency factor. In Whiteco Industries, Inc. v. Commissioner,65 T.C. 664, 672-673 (1975), dealing with the issue whether outdoor advertising signs were "inherently permanent structures" within the meaning of the regulation (sec. 1.48-1(a), Income Tax Regs.), the Court listed six questions which are helpful in applying the permanency test: (1) Is the property capable of being moved, and has it in fact been moved? * * * (2) Is the property designed or constructed to remain permanently in place? * * * (3) Are there circumstances which tend to show the expected or intended length of affixation * * *? * * * (4) How substantial a job is removal of the property and how time-consuming is it? * * * (5) How much damage will the property sustain upon its removal? * * * (6) What is the manner of affixation of the property to the land? * * * Although the *52 issue in that case was whether the outdoor advertising signs were "inherently permanent structures," rather than whether they were structural components of such a structure, these questions have been used in determining the degree of the permanency of the installation of, and the allowability of the credit claimed for, partitions in Mallinckrodt, Inc. v. Commissioner,T.C. Memo. 1984-532 (1984), affd. per curiam 778 F.2d 402 (8th Cir. 1985), and other types of property in Standard Oil Co. (Indiana) v. Commissioner,77 T.C. 349, 407-409 (1981); Kimmelman v. Commissioner,72 T.C. 294, 308 (1979). 1. The Partitions
The allowability of the investment tax credit for three separate sets of partitions is in dispute: (A) gypsum board partitions, (B) "storefront" partitions, and (C) toilet partitions. (A) Gypsum Board Partitions
The gypsum board partitions installed in Pro II and the Glen are not weight-bearing and are comprised of a sheet metal frame which is screwed together with small screws. The frame's bottom channel is attached to the concrete floor with masonry nails. The top channel is attached to *53 a brace with small screws at intervals of 4' to 8'. Sheet metal studs are screwed to the floor channels and the top channels. Standard sized gypsum board panels are screwed to the metal frame, taped at the seams, smoothed with filler, and sanded and painted or covered with wallpaper or panelling. The gypsum board panels are 4' X 8' or 4' X 9' and are 5/8" thick. The studs in the metal frames are 8' or 9' lengths to coordinate with the panels. The top and bottom tracks are standard 10' lengths. The gypsum board partitions used by Metro can be readily and economically moved and reused. [6] Removal is accomplished by first locating the screws with a screw detector, backing out the screw with an electric screw gun, slitting the seams with a utility knife, lifting the gypsum board from the frame, unscrewing the sheet metal studs from the sheet metal tracks, unscrewing the top base, and popping the nails from the bottom track. The time required is approximately 15 minutes by one man per panel. The removal process does not damage other *54 partitions, the ceiling, floor, or building structure. Any screw or nail holes left in other partitions or the floor can be readily covered with a compound. The removed materials can be efficiently reinstalled in another partition with a minimum amount of wastage. The reused gypsum board when refinished has the same appearance and utility as new gypsum board. Metro has followed a policy of dismantling and reusing gypsum board partitions immediately or storing the materials for future use. A cost comparison on a linear foot basis between moving and reusing existing partitions and demolishing the old partitions shows a savings of 29 percent per linear foot of partition. [7] Since Pro II and the Glen were completed in 1981, partitions have been moved and reused on 10 or 12 different remodeling jobs at Pro II and the Glen. When the need has arisen, partitions have been removed from one building and used in another, or stored for future use. *55 If the partitions were not reused, they would be first torn down, then reduced to rubble, loaded into a wheelbarrow and removed from the building, loaded on a truck, and driven to the dump. New materials would have to be ordered, transported to the jobsite, moved up the elevator, and then assembled. Disassembly and reuse avoids these costs, is cleaner and neater, and avoids disturbing tenants. Most of the leases in Pro II have run from 3 to 5 years. When a lease is renewed, the tenant frequently requests that changes be made in the location of the partitions. New tenants also often ask for floorplan changes. Many of the partitions would be moved after 3 to 5 years. We think the foregoing facts demonstrate that the gypsum partitions are tangible personal property within the meaning of section 48(a)(1)(A). These partitions, as stated in our general findings, were not included in the architectural plans for the buildings but were installed, and may be moved or eliminated to serve the needs of the individual tenants. They are not structural components of the buildings under section 1.48-1(e), Income Tax Regs. They contribute nothing to the "integrity *56 of the building itself" and are not related to the operation and maintenance of the buildings. King Radio Corp., Inc. v. United States,486 F.2d 1091, 1092 (10th Cir. 1973). We are aware that the regulation (sec. 1.48-1(e)(2), Income Tax Regs.) defines "structural components" to include "walls" and "partitions." In many buildings, walls and partitions are structural components of the building. They relate to, and often are essential to, the operation and maintenance of the building and are permanently installed. In S. Rept. No. 95-1263 (1978), 1978-3 C.B. 321, 415, quoted in part above, however, Congress made clear that its intention was that the credit should not be denied for all partitions, as the illustration in the regulation would indicate, and that the credit should be allowed for "movable and removable" partitions, which have only an incidental relationship to the operation or maintenance of the building in which they are used. The facts here show that the gypsum drywall partitions used by petitioners meet that criterion. Under the Whiteco standards on permanency ( Whiteco Industries, Inc. v. Commissioner,65 T.C. 664, 672-673 (1975)), *57 quoted above, (1) the partitions are capable of being moved and have in fact been moved; (2) the partitions are so designed and constructed that they need not remain permanently in place but may be moved; (3) at least some of the partitions in the tenants' space may be reasonably expected to be moved each 3 to 5 years; (4) the removal job is sufficiently simple to make disassembly and reassembly of a partition considerably more economical and practical than demolishing the partition and rebuilding it with new materials; (5) only a minor amount of damage is sustained by removal of a partition; and (6) the partitions are attached with nails driven into the concrete floor and to the ceiling with screws at intervals of 4' to 8' which can be readily removed. Four decided cases have dealt with the allowability of the investment tax credit with respect to partitions: King Radio Corp., Inc. v. United States,supra, and Minot Federal Savings & Loan Association v. United States,435 F.2d 1368 (8th Cir. 1970), which allowed the investment tax credit; Mallinckrodt, Inc. v. Commissioner,T.C. Memo. 1984-532, affd. per curiam 778 F.2d 402 (8th Cir. 1985), *58 and Dixie Manor, Inc. v. United States, an unreported case ( W.D. Ky. 1979, 44 AFTR2d 79-5442, 79-2 USTC par. 9469), affd. without published opinion 652 F.2d 57 (6th Cir. 1981), which denied the claimed credits. [8]
The facts in this case stand somewhere between the facts in the two sets of cases. We think they stand nearer the facts of King Radio and Minot and we hold, on the evidence before us, that the investment tax credit is allowable with respect to the gypsum drywall partitions. We recognize that the partitions in King *59 Radio and Minot, although attached to the floor and ceiling in the same manner as the partitions here in controversy, were made on an assembly line, and could be moved and parts of them could be stored without being disassembled. We find nothing in the statute, its legislative history, or the regulations, however, that denies the credit for partitions which, as in this case, are movable and removable by following the procedures described above even though that procedure involves disassembling and reassembling the partitions. The manner in which they are moved or movable does not affect their relationship to the operation or maintenance of the buildings. In Mallinckrodt, Inc. v. Commissioner,supra, this Court held that the gypsum drywall partitions in that case did not qualify as section 38 property. In that case, however, the Court found that under the "most economical and preferred method" of removal and reuse of partitions, "most of the materials are scrapped and replaced"; in the best of circumstances, "a 2' X 8' gypsum board panel would be lost, even if salvaging the drywall is intended." The Court also found that "The partitions have never been *60 moved, nor has Mallinckrodt adopted a plan or procedure for dismantling and moving the partitions" and that "The partitions were installed in such a way that any attempt to remove them would result in their destruction." In addition, the Court stated that "The partitions here have not been moved since their installation during the original construction of the building" and that "The usual and economically efficient method to remove the instant partitions is to demolish them and throw the gypsum board away." These facts in Mallinckrodt stand in stark contrast with the facts in the instant case where a program for dismantling and reinstalling moved partitions was planned before the buildings were constructed; the partitions were installed and can be, and on occasions have been, moved to meet the wishes of the tenants; in the first 5-year period of the operation of the buildings, partitions have been dismantled and reinstalled for 10 to 12 remodeling jobs; dismantled materials are used on remodeling jobs or stored by Metro for future use; and dismantling and reinstalling partitions reduces remodeling costs by about 29 percent. [9]
*61 (B) Storefront Partitions
The record is not entirely clear but we interpret it to show that the "storefront partitions" were used as the walls of a hallway facing the atrium on each of the three floors of Pro II and as the walls of interior corridors. The storefront partitions are anodized aluminum, 3' X 8' frames which hold either a door or glass panel. These frames are slipped over a C-shaped track at the top and bottom. Hinges are attached to the door units and the doors are hung with pins. Glass stops hold the glass panes in place. The bottom and top channels are attached in the same manner as the channels for the gypsum board partitions. To remove storefront partitions, the glass or door is removed, the metal frames are slipped off the channels, and the channels are removed in the same manner as the channels for gypsum board partitions. As a general rule, removal causes no damage to the partitions or to the surroundings. They may be removed, stored, and reused as needed. When Pro II was built, the storefront partitions facing the atrium at the front of each suite of offices were arranged in identical patterns. When the suites were leased for the first *62 time, the configuration was changed by moving the door, window, and other units to accommodate the floorplan and partitioning of each particular rental space. On at least two occasions after the building was occupied, interior corridors have been eliminated to accommodate the needs of the tenants -- in one case for a patients' waiting room for a radiation treatment center and in another case for a large dental group. The panels forming the interior corridors were removed and used elsewhere or stored for future reuse. In our opinion, the storefront partitions used in the interior corridors are section 38 property. These partitions are not structural components but are "movable and removable" partitions within the meaning of S. Rept. No. 95-1263 (1978), 1978-3 C.B. 321, 415, quoted in part above. They are not permanently installed but may be moved or eliminated at the request of the tenants, as illustrated by the elimination of the two interior corridors at the request of the tenants on the occasions described above. The removal of these partitions does not adversely affect the utility of the building or cause any damage to the structure of the building. These partitions *63 do not relate to the maintenance or operation of the building but are installed or eliminated to accommodate the tenants. The investment tax credit is allowable with respect to them. [10]
As to the storefront partitions which form the walls between the atrium and the rented office space, however, the opposite answer is required. *64 Pro II was planned, designed, and has been actually used as rental space for doctors and dentists. As we interpret the sparse evidence on the point, if the partitions (walls) facing the atrium were removed or eliminated, the offices of the tenant doctors and dentists on all three floors would open onto the atrium without any way of closing or otherwise securing the offices. Obviously, such an arrangement would be impractical. We think the storefront partitions facing the atrium are, within the meaning of section 1.48-1(e)(2), Income Tax Regs., structural components of the building, i.e., "walls * * * relating to the operation or maintenance of a building." In reaching this conclusion, we are fully aware that panels, windows, and doors comprising the storefront partitions facing the atrium could be, and were, rearranged to accommodate the tenants' floorplans. When Pro II was first occupied, as we have discussed, however, the storefront partitions used as the walls between the offices and the atrium were permanently an integral part of the structure of the building. Although the configuration of the walls could be changed by rearranging panels, the walls *65 could not be moved, removed, or eliminated. The building simply could not be operated as leased space for doctors and dentists without these walls. In this crucial respect, these walls differ from the gypsum drywall partitions and the storefront corridor partitions discussed above. They are also different in the same respect from the movable and removable partitions dealt with in King Radio Corp., Inc. v. United States,486 F.2d 1091 (10th Cir. 1973), and Minot Federal Savings & Loan Association v. United States,435 F.2d 1368 (8th Cir. 1970). The partitions in those cases were used to separate interior office space, not as walls between offices and an open atrium, or a similar open space; they were not an integral part of the structure and their removal caused no "noticeable damage to the building." King Radio Corp., Inc. v. United States,supra at 1095, 1095. In reaching different conclusions with respect to the interior corridors and the atrium office walls, we are not using a functional use test, i.e., the function of the property is the criterion by which it should be classified. That test, initially used by the Commissioner, *66 was abandoned in Revenue Ruling 75-178, 1975-1 C.B. 9, after it had been rejected by the courts. Minot Federal Savings & Loan Association v. United States,supra; King Radio Corp., Inc. v. United States,supra;Estate of Morgan v. Commissioner,52 T.C. 478 (1969), affd. per curiam 448 F.2d 1397 (9th Cir. 1971); Roberts v. Commissioner,60 T.C. 861 (1973). Rather, we are looking at the structure of the building, ascertaining the components relating to the operation and maintenance of the building as rental space, for which it was designed, and in doing so examining the permanency characteristic discussed above. Cf. Moore v. Commissioner,58 T.C. 1045, 1052-1053 (1972), affd. per curiam 489 F.2d 285 (5th Cir. 1973). [11]
(C) Toilet Partitions
Toilet partitions, *67 some of which are shop made and others standard manufacture, are either freestanding or are screwed to the adjacent partitions or ceiling. In some cases, an all-thread rod goes through the false ceiling and screws into the true ceiling. The toilet partitions are then attached with a nut to the all-thread rod. The partitions can be unscrewed and easily moved without substantial damage. Removal takes about the same amount of time as the original installation. The partitions have been temporarily removed and repainted to cover graffiti but the record does not show that they have been removed without being replaced with the same or similar partitions. We do not think these partitions qualify for the credit because they are structural components of the building. The location of the toilets, essential to the operation of the building, is controlled by the plumbing facilities which are quite obviously structural components of the buildings. Sec. 1.48-1(e)(2), Income Tax Regs. As long as there are toilets, partitions will be needed; they are thus related to the operation of the building as rental space. [12]
*68 Although the toilet partitions in Pro II and the Glen are easily movable, the partitions will almost assuredly remain in place for the duration of their useful lives. They cannot be eliminated. There would be few anticipated or planned occasions on which they would be moved. Because movability is not the sole test, we hold that the toilet partitions are structural components of the building and do not qualify for the investment tax credit. 2. False Ceilings and Lay-in Lighting
The false ceiling is composed of a "snap together" grid of metal T-strips suspended from the bare ceiling with wires twisted to obtain the proper elevation. Acoustical ceiling tiles, which are typically 2' X 4' standard size panels, are laid in place on the grid system. Light panels, which are standard sized prefabricated fluorescent fixtures in light metal housings, typically of the same dimensions as the acoustical panels, are laid on the false ceiling grid. The ceiling grid snaps together and can be assembled or disassembled in a matter of minutes. The ceiling tiles are not attached to the structure. Each light panel is attached to a junction box by an 8' to 10' BX cable. The BX cable *69 has three wires which are screwed to the appropriate wires in the junction box with small plastic caps. Lighting and ceiling tiles may be, and are, moved to suit the needs or wishes of the tenant at any particular time. We do not think the false ceilings and lay-in lighting are section 48(a)(1)(A) tangible personal property qualifying for the investment tax credit. Some form of ceiling and lighting system is required to make the building usable by tenants; the ceilings and lighting fixtures are thus related to the operation of the building as rental space. Petitioner's false ceiling system is a "ceiling" and the lay-in lights are "lighting fixtures" within the meaning of section 1.48-1(e)(2), Income Tax Regs.Metro chose the system which is here in dispute, and we think it will remain in place during its useful life. True, according to the testimony, a few of the tenant-psychiatrists have chosen not to have the false ceiling system and have chosen instead to have the true ceiling color blasted and used as their office ceilings. But those true ceilings and related lighting fixtures are not here in dispute. There is no evidence that tenants have switched *70 from use of the true ceiling to use of the false ceiling and vice versa on anything like a regular basis. We recognize that the acoustical tile can be removed very easily and that the location of the individual lighting units can be easily changed. If petitioner were correct that movability is the test for identifying tangible personal property, the ceiling lighting fixtures might qualify. As we have discussed, however, movability is only one factor to be considered in applying the test of the regulations and decided cases. The movability of the ceiling and lighting fixtures in this case does not show they are not permanent. Rather, it merely demonstrates the efficiency of the false ceiling and related light system. The movability of the system facilitates normal maintenance above the ceiling, such as adjusting dampers in the air-conditioning ducts, inspecting electrical wiring, adding communication wiring and speakers where needed, adjusting or repairing thermostats and making routine fire prevention and building inspections. It does not show that they are not structural components. The false ceiling and lay-in lighting fixtures differ from the gypsum wall partitions. Those *71 partitions were planned from the time the buildings were designed to be moved and removed to accommodate the needs of the tenants. A tenant's entire leased space could be used without partitions or the space could be cut into small cubicles and the building was so planned from the outset. In contrast, as we have discussed, a ceiling and lighting system is essential to the operation of the building. 3. Security and Decorative Lighting
Three types of lighting are in dispute: (a) Accent security lights at the Glen, (b) grow lights at Pro II, and (c) outside decorative lighting at Pro II. The security lights at the Glen, spaced about 20 feet apart around the outside perimeter of the building, are flood lights mounted flush with the building soffit, i.e., the underside of the roof overhang. The lights are wired to an electric junction box and sealed in the wooden soffit with a snap-on aluminum or plastic rim, like an automobile headlight. These lights can be easily removed without damage to themselves or their surroundings. Their removal does not affect the integrity of the building. The grow lights at Pro II are floodlights mounted flush with the false ceiling wire to *72 an electric junction box above, and sealed in the ceiling with a snap-on rim, like the soffit lights at the Glen. They are placed in hall corners as grow lights for plants. The grow lights are easily removable without damage to themselves or their surroundings. The decorative lighting at Pro II is an outside pedestal light which has a frame screwed to the concrete foundation. The light is used to highlight landscaped areas or to aid in the growing of plants. The outside lights may be moved easily as the landscaping is changed. We hold that all three of those types of lighting are tangible personal property for which the investment tax credit is allowed. In S. Rept. No. 95-1263 (1978), 1978-3 C.B. 315, 415, it is explained that tangible personal property includes "special lighting (including lighting to illuminate the exterior of a building or store, but not lighting to illuminate parking areas), false balconies and other exterior ornamentation that have no more than an incidental relationship to the operation or maintenance of a building * * *." We think all three types of the disputed lighting fixtures are "special lighting" under the Senate Report. They are *73 only incidentally related to the operation of the building. More specifically as to the accent and security lights at the Glen, the reference in S. Rept. 95-1263, supra, to special lighting which illuminates the exterior of the building provides the answer.Also, those lights serve the special needs of the psychiatric facility which occupies the building by illuminating the area around the building. This assists in preventing unauthorized departures by patients and reassures residents in the area with respect to security. In that sense the lights are "accessory to a business" within the meaning of S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 722, quoted in part above. Both the interior and exterior lights at Pro II provide for the ornamentation of the building, the grow lights for plants inside, and the lights to accentuate shrubbery on the outside. The parties have agreed that the credit is allowable for the atrium planters; it is difficult in those circumstances to see why the credit should not be allowed for lights which help make ornamental plants grow or which display shrubbery. In our opinion, they fall squarely within the language *74 of S. Rept. 95-1263, supra.[13]
4. Cabinets
Cabinets (including laminated plastic and cabinet hardware), prefabricated modular units built either at Metro's cabinet shop or by Leedo Manufacturing Company are installed in Pro II and the Glen in order to meet the tenants' needs. Completed cabinets are installed by screwing them to the partitions or adjacent cabinets or are freestanding. Some units are caulked at horizontal and vertical places of contact with the partitions or exterior walls to prevent liquids from running behind the cabinets. The caulking is not an adhesive. It can be removed without difficulty. The cabinets can be easily moved. If they are screwed to *75 a wall or partition, the screws can be readily removed. There is no damage to the cabinets or to the building structure when they are moved, and the screwholes can be easily repaired or refinished. Moving cabinets to meet tenants' needs is a common occurrence. The cabinets containing plumbing can be moved and the needed repairs made when the needs of the building's occupants change. We think it quite clear that the cabinets are not structural components relating to the operation and maintenance of the buildings. They are not designed or constructed to remain in place but are capable of being, and have been, moved or eliminated, depending on the tenants' business needs. They are, in our judgment, "accessory to a business" within the meaning of S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 722. They are not related to the operation and maintenance of the building. About 5 percent of the cabinets have sinks which are attached to the plumbing. The evidence shows that even those cabinets can be easily moved within a short time, without damage, by the simple process of removing screws, disconnecting any attached plumbing, and lifting them out of *76 place. Respondent conceded on brief that the freestanding cabinets qualify for the credit. We do not think the fact that these other cabinets are attached to a wall or partition and are easily movable calls for a different answer as to them. The credit is allowable with respect to the cabinets. 5. Sprinkler Heads
To provide water for vegetation on the building grounds, Metro installed an underground water system.The water from the pipes is diffused by sprinkler heads. The sprinkler heads can be easily removed by turning them counterclockwise and removing them from the pipes. After removal a cap may be screwed onto each vacated pipe to seal the system. Petitioner contends the credit is allowable for these sprinkler heads. We do not think the sprinkler heads qualify as tangible personal property for which the credit is allowable. Again, if movability were the test, they might qualify. The sprinkler heads, are, however, inseparable from, and give utility to, the underground pipes. The underground water system is an "inherently permanent structure" within the meaning of the regulation (sec. 1.48-1(c), Income Tax Regs.), and petitioner concedes *77 that the underground water system itself does not qualify for the credit. The sprinkler heads are essential, detachable parts of that system and they relate to its operation under the principles of the regulation (sec. 1.48-1(e)(2), Income Tax Regs.). The credit is not allowable for the sprinkler heads. [14]
To reflect the foregoing and the disposition of other issues by agreement of the parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. SEC. 48.DEFINITIONS; SPECIAL RULES. (a) Section 38 Property. -- (1) In general. -- Except as provided in this subsection, the term "section 38 property" means -- (A) tangible personal property * * * ↩
3. The investment tax credit provisions were designed to stimulate the economy by reducing the net cost of acquiring selected depreciable assets, thereby increasing the cash flow available for investment. S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707↩, 716-717.
4. In H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) 125, 159, and S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) 505, 545, is the following comment on this regulation: The proposed regulations issued by the Treasury Department with respect to the term "structural components" provide an extensive list of the type of items considered to be structural components and therefore not eligible for the investment credit. * * * [T]hese regulations are an accurate interpretation of the intention of Congress last year in this respect. * * *↩
5. This comment, contained in a report on the Revenue Act of 1978, was made with respect to the Revenue Act of 1971, which re-enacted the investment tax credit provisions. The Supreme Court has made the general observation that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." United States v. Price,361 U.S. 304, 313 (1960). The report quoted in the text, however, dealt with a number of changes in the investment tax credit provisions which were enacted. Rather than include in the legislation the items and principle set forth in the report, the report stated the credit was already authorized for them. Dealing with a somewhat similar situation, the Supreme Court observed that a "statement by the Committee which reported the General Allotment Act of 1887, made within five years of its passage, is virtually conclusive as to the significance of that Act." Sioux Tribe v. United States,316 U.S. 317, 329-330 (1942); see also Estate of Shedd v. Commissioner,23 T.C. 41, 46 (1954), affd. 237 F.2d 345↩ (9th Cir. 1956). The statement quoted in the text, in our view, may be taken as a clear indication of congressional intent with respect to the allowability of the investment tax credit. We do not understand either party to contend otherwise.
6. The record includes a videotape showing and explaining the several steps involved in the process of disassembling a gypsum board partition.↩
7. It is stipulated: Gypsum board partitions can be moved where care is taken. Where the owner assists in removal incident to remodeling in a particular area, the cost of moving and reusing gypsum board partitions can be less than the cost of demolishing and building new partitions with new materials. Respondent argues the cost of moving and reusing the partitions is irrelevant. We think, however, that it has some bearing on intention with respect to permanency. Also, we note that heavy emphasis was placed on this factor in Mallinckrodt, Inc. v. Commissioner,T.C. Memo. 1984-532, affd. per curiam 778 F.2d 402↩ (8th Cir. 1985), where respondent prevailed on the allowability of the credit for gypsum board partitions.
8. In Fleming v. Commissioner,T.C. Memo. 1985-165↩, warehouse storage rooms were separated by movable partitions. "The moveable partitions consisted of large (1" thick by 8' height by 2' width) panels of Gypsum coreboard or drywall that were glued together and placed in metal channels that had been secured to the floor and ceiling of each warehouse." After denial of the investment tax credit for these partitions in the notice of deficiency, respondent conceded its allowability prior to trial. The issue litigated was the cost basis of the partitions for purposes of applying the percentage credit.
9. The facts here are also distinguishable from Dixie Manor, Inc. v. United States, an unreported case ( W.D. Ky. 1979, 44 AFTR2d 79-5442, 79-2 USTC par. 9469), affd. without published opinion 652 F.2d 57 (6th Cir. 1981). That case involved drywall attached to 2" X 4" wood studs installed between 2" X 4" wood plates on the floor and ceiling. The partitions were removable by sawing through the drywall and plates and using a sledge hammer to tear the walls out and knock the 2" X 4"s loose. The partitions were not capable of being used in their entirety or of being stored. To remove them would damage the ceiling tile and certain floor tile. The principal fact in common between the Dixie Manor↩ case and the instant one is that the walls had to be changed when new tenants were substituted for old ones but the court stated that this factor alone was not sufficient to qualify the walls for the credit.
10. In Mallinckrodt, Inc. v. Commissioner,T.C. Memo. 1984-532, affd. per curiam 778 F.2d 402 (8th Cir. 1985), it is stated: In addition to the previously described offices, Mallinckrodt used offices 10' X 15' in dimension for lower ranking employees. These offices utilized the load bearing exterior masonry wall of the perimeter of the building with its window as one side. The side of these offices opposite the perimeter wall consisted of a partition of glass with metal housing and trim, or "storefront," for which Mallinckrodt claimed, and was allowed, the investment credit. * * * [Emphasis added.] See also King Radio Corp., Inc. v. United States,486 F.2d 1091 (10th Cir. 1973), and Minot Federal Savings & Loan Association v. United States,435 F.2d 1368↩ (8th Cir. 1970).
11. As far as we have been able to ascertain, the record does not disclose what part of the $216,143 cost of "storefront partitions" is allocable to each of the two categories discussed above. The allocation should be made by the parties in connection with the Rule 155 computation.↩
12. Cf. Morrison, Inc. v. Commissioner,↩ T.C. 1986-129.
13. In Consolidated Freightways, Inc. v. Commissioner,708 F.2d 1385, 1390 (9th Cir. 1983), affg. in part and revg. in part 74 T.C. 768↩ (1980), the court of appeals reversed our determination that certain lighting fixtures were eligible for the investment tax credit. This Court has not yet decided whether to follow the Ninth Circuit's reversal, and we need not do so here. In that case, the fixtures in issue were not "special lighting" of the character here in issue.
14. The regulation (sec. 1.48-1(e)(2), Income Tax Regs.↩) lists "sprinkler systems" as an example of a structural component of a building. We interpret this example to refer to fire prevention sprinkler systems installed in many buildings, and we understand that the parties so agree.