T.C. Memo. 2012-67

UNITED STATES TAX COURT

AMERISOUTH XXXII, LTD., AMERISOUTH TEXAS III, LLC, TAX
MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21686-07.                     Filed March 12, 2012.

Matthew I. Root and Jennifer S. McGinty, for respondent.

MEMORANDUM OPINION

HOLMES, Judge:  AmeriSouth XXXII, Ltd. bought an apartment complex

in 2003 for $10.25 million.  The Commissioner argues that with minor exceptions

the apartment complex is one asset that AmeriSouth must depreciate over 27.5 years. AmeriSouth argues that, whatever the apartment complex may look like to an untrained observer, to a tax adept it is not a single asset but a collection of more than 1,000 components depreciable over much shorter periods. It is usually the case that a shorter depreciation period benefits taxpayers. It would certainly benefit AmeriSouth by generating hundreds of thousands of dollars' worth of accelerated depreciation deductions. We are tempted to say this is why AmeriSouth throws in everything but the kitchen sink to support its argument--except it actually throws in a few hundred kitchen sinks, urging us to classify them as "special plumbing," depreciable over a much shorter period than apartment buildings.

## Background

This story begins with a limited liability company called AmeriSouth Texas III, LLC and its managing member and 100-percent owner, Ruel Hamilton, a real-estate veteran. AmeriSouth Texas is the general partner in "something like" 50 AmeriSouth partnerships dubbed AmeriSouth I through--the record's a bit uncertain--AmeriSouth XLII, plus a few with slightly different names. Each AmeriSouth partnership owns an apartment complex, and over the years AmeriSouth Texas has owned approximately 10,000 apartment units, mostly in

Texas.  AmeriSouth Management, L.P., which Hamilton also manages, maintains at least some of these apartment complexes.

This case involves only one of the AmeriSouth Texas partnerships, AmeriSouth XXXII, Ltd.  AmeriSouth Texas established AmeriSouth XXXII in 2003 to buy the Garden House Apartments (Garden House) in Mesquite, Texas.[1] Built in 1970, Garden House sprawls across more than 16 acres of land and includes more than 40 buildings, most of which are two-story apartment buildings averaging nine apartments each.  The complex also has some common buildings--three pool cabanas, a storehouse for mechanical equipment, and a leasing office building. Most units are one to three bedrooms, although there are a few four-bedroom units.

Of its 366 units, approximately 70 are fully-furnished "guest apartments." And even unfurnished units contain dishwashers and garbage disposals.  Some units have laundry rooms and hookups for washing machines and dryers with their own plumbing and electrical connections.  There are also laundry areas with their own plumbing and electrical connections in some of the apartments for renters who either bring their own machines or rent them from AmeriSouth.  And for those renters who

---

[1] AmeriSouth XXXII bought Garden House for $10.25 million.  When AmeriSouth bought Garden House, rent ranged from $410 to $1,317 per month and occupancy stood at 82 percent.

don't rent or bring their own, an outside company--Coinmach--maintains washers and dryers in seven common laundry rooms. These laundry rooms have floor drains, plumbing, and gas lines.

At least some of Garden House's units sport painted base molding (a strip of wood at the base of the wall where it meets the floor), crown molding (same idea but at the ceiling), and chair rail (somewhere between the floor and ceiling, and in this case usually only in the dining rooms). Besides chair rail, the dining rooms also feature a built-in framed mirror, and some have a ceiling light with a paddle fan. Some kitchens and living rooms have shelving set into the wall and about 80 apartments have hardwood floors instead of carpeting.

Garden House of course has electric and gas lines, water pipes, and sanitary sewers drawing from the main city lines underground, though some electrical lines are overhead. There are public access, utility, and sanitary-sewer easements, running from the public street across AmeriSouth's property to its buildings. Electricity flows into the complex from overhead lines down to an underground transformer on AmeriSouth's property. The transformer, which AmeriSouth doesn't own, reduces the voltage in the wires to a residential level. From there, secondary electric lines carry the current to outdoor light posts and to main electrical panels on each building. The wires split again after hitting the main panel and spider

throughout the building behind the walls to panels in each apartment. From there they run throughout each apartment, where they end behind outlets and junction boxes for light fixtures. At least one report shows that many of Garden House's electric panels aren't properly labeled.

Renters plug into the electricity via many outlets scattered throughout the buildings. Each apartment's kitchen has a duplex (two-prong) outlet four feet above the ground behind the refrigerator and a three-prong, 220-volt outlet for the sole purpose of powering the stove. There are also duplex outlets above the countertops, presumably for small kitchen appliances. In apartment units with laundry areas, there is a duplex outlet where the clothes washer may be installed and a three-prong, 220-volt outlet for the clothes dryer. The common laundry rooms have typical electric outlets in areas designed for clothes washers, while the office building has duplex outlets in places convenient for office and exercise equipment. And there are specialized outlets for cable lines, data lines, and telephones in apartments and the office building.

Each apartment and the office building has a stainless steel kitchen sink, and there is a plastic utility sink in the office building as well. Garbage disposals are set into one of the drains of the kitchen sink in each apartment unit and the office building so that the waste piping connected to the garbage disposals carries away

the water and waste coming from the kitchen sinks. The garbage disposals are electric and plug into electric outlets located near them. The dishwashers also plug into electric outlets, but they have their own smaller water lines that branch off from the main water line.

As soon as AmeriSouth bought Garden House, it began a $2 million renovation of the apartments that included replacing cabinets and countertops, dishwashers, garbage disposals, vent hoods, and kitchen sinks.

As it prepared to file its 2003 information return, AmeriSouth needed to decide how to report its income and expenses. One major expense it faced was depreciation. Apartment buildings generally get depreciated over 27.5 years, and AmeriSouth originally listed Garden House as "27.5-year property" in its records. Before it filed its 2003 information return, however, AmeriSouth scouted out a more advantageous position. It hired MS Consultants to do a cost-segregation study. MS visited Garden House and mentally deconstructed it into over 1,000 parts. MS advised AmeriSouth that items such as sinks, outlets, paint, and the electric wiring connected to garbage disposals could be depreciated, not as part of the buildings they were attached to, but by themselves. Because a sink, for example, has a shorter expected life span than an apartment building, depreciating these components separately would have sped up Garden House's depreciation

considerably, leading to lower taxes for AmeriSouth. MS calculated that about $3.4 million of AmeriSouth's property could be depreciated over 5 or 15 years instead of 27.5. This increased AmeriSouth's depreciation deduction by approximately $397,000 in 2003, $640,000 in 2004, and $375,000 in 2005. MS boasted that its plan for Garden House would defer taxes of almost $730,000 for 2003 through 2007.

The cost-segregation study separated the components at issue into the following 12 categories:[2]

- site preparation and earthwork;

- water-distribution system;

- sanitary-sewer system;

- gas line;

- site electric;

- special HVAC;[3]

- special plumbing;

- special electric;

---

[2] The parties adopt these categories for ease of discussion, and so will we, without attaching any legal significance to the titles.

[3] HVAC means heating, ventilating, and air conditioning.

- finish carpentry;

- millwork;

- interior windows and mirrors; and

- special painting.

AmeriSouth took MS's advice, reporting depreciation on its returns as follows:

| Year | Depreciation expense |
|------|---------------------|
| 2003 | $632,674 |
| 2004 | 1,578,212 |
| 2005 | 818,143 |

AmeriSouth claimed on its returns that the water-distribution and sanitary-sewer systems, the gas lines, and the site electric were eligible for 15-year depreciation; it claimed property in the other categories was eligible for 5-year depreciation. The Commissioner disagreed, reasoning that some of the parts AmeriSouth wants to depreciate quickly can be depreciated only as pieces of a whole building that it must depreciate more slowly over 27.5 years and that some of the parts that AmeriSouth wants to depreciate aren't depreciable at all. He issued

Final Partnership Administrative Adjustments[4] for 2003, 2004, and 2005, denying deductions of $314,996, $508,977, and $255,778, respectively. The Commissioner raised one more argument for the first time at trial--that AmeriSouth was also trying to depreciate some assets it doesn't even own. AmeriSouth Texas, as AmeriSouth's TMP, filed a petition to challenge the Commissioner's adjustments, and we tried the case in Buffalo, New York. The default appellate venue, however, is likely the Fifth Circuit because AmeriSouth's principal place of business was in Dallas, Texas, when the petition was filed. See sec. 7482(b)(1)(E).[5]

---

[4] Partnerships themselves don't actually pay income tax--instead, each partner reports a pro-rata portion of the partnership's income on his individual tax return. To try to reach consistent results among partners and decrease the cost of auditing partnership returns, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648. Under TEFRA, the Commissioner audits a partnership at the partnership level. If the Commissioner makes any adjustments to partnership items after concluding the partnership-level audit, he issues a Final Partnership Administrative Adjustment to alert the partners. Each TEFRA partnership is supposed to designate one of its partners as TMP--tax matters partner--to handle TEFRA issues and litigation for the partnership. AmeriSouth Texas is AmeriSouth's TMP.

[5] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

Adding another twist, AmeriSouth sold Garden House about the time the case was tried, and stopped responding to communications from the Court, the Commissioner, and even its own counsel. We suspended briefing in an attempt to figure out what was going on and ended up ordering AmeriSouth to show cause why its attorneys should not be allowed to withdraw from its case. Without any response to the Court, we granted the attorneys' motion to withdraw and so AmeriSouth has been left representing itself. The Court then ordered AmeriSouth to file a posttrial brief, which it never did.

Because the Court ordered a posttrial brief and AmeriSouth didn't file one, we could dismiss this case entirely. See Rules 123, 151(a); Stringer v. Commissioner, 84 T.C. 693, 704-08 (1985), aff'd without published opinion, 789 F.2d 917 (4th Cir. 1986). Despite AmeriSouth's lack of response and mysterious disappearance, however, we will not do so. We will, though, deem any factual matters not otherwise contested to be conceded. See Diesel Country Truck Stop, Inc. v. Commissioner, T.C. Memo. 2000-317.

## Discussion

The details of depreciation spur many to more interesting pastures, but the basic concept is easy to understand. A general goal of taxation is to match the income and the expenses associated with producing that income. See INDOPCO,

Inc. v. Commissioner, 503 U.S. 79, 84 (1992). In this way taxes more closely reflect economic profit. Items that are bought and used in the same year are easily identified as deductible costs related to that year. And smaller expenses, even if for items that last longer than a year, are often deductible rather than depreciable just because it is too cumbersome to keep track of each pencil or paperclip.

Yet a taxpayer who buys longer lasting, more expensive items, like manufacturing equipment, may have a large cash outlay in one year that will help produce income for many years to come. Without some sort of allocation, the economic wear and tear of the equipment will not offset that future income--instead, the taxpayer would have an inflated loss in the year he bought the equipment.

And that's what depreciation recognizes--taxpayers take reasonable deductions against income for the exhaustion and wear and tear of property used in a trade or business or held for the production of income. See sec. 167(a). In this way, taxpayers recover the cost of their investments as they are used. And because depreciation is an accounting creation that reflects gradual wear and tear, and not the initial cash expense, it follows that assets that cost money but don't suffer from wear and tear--like land--are not depreciable. See sec. 1.167(a)-2, Income Tax Regs.

So much for theory. Applying depreciation in the real world can be more difficult. This is in part because it uses a very specific but not-so-intuitive vocabulary. For example, to calculate a depreciation deduction, a taxpayer must first determine the "basis" of an asset (usually its cost, at least initially), see secs. 1011, 1012, 1016, as well as the asset's "class life"--a range of years reflecting the anticipated useful life of that type of property to a particular industry or other group, see sec. 168. Then the method of depreciation determines the amount he can deduct each year.

For property placed into service after 1986 (and all property in this case), the Code generally requires the use of the Modified Accelerated Cost Recovery System (MACRS).[6] See Tax Reform Act of 1986, Pub. L. No. 99-514, secs. 201, 203, 100 Stat. at 2121, 2143. The first step in using MACRS is classifying the assets to determine the proper recovery period. This is what AmeriSouth and the Commissioner are fighting about here. MACRS provides lists of the appropriate classifications for some specific assets. See sec. 168(e). (Race horses older than two years when they are placed into service, for instance, are specifically listed as

---

[6] Though Garden House was built in 1970, AmeriSouth first placed it in service by buying the complex in 2003, so MACRS applies to all property in question. See Broz v. Commissioner, 137 T.C. 25, 37 (2011) ("An asset is placed in service when it is acquired and put into use" by the taxpayer).

"3-year property." Sec. 168(e)(3)(A)(i).) If an asset doesn't fit into one of the listed categories, then the taxpayer must classify the asset by class life. See sec. 168(e)(1). For example, an otherwise unclassified asset expected to last more than four years but less than ten would be "5-year property." Id.

Once an asset is classified, MACRS then tells us the applicable depreciation method and recovery period.[7] See sec. 168(b) and (c). Residential rental property commands its own category: MACRS specifically requires use of the straight-line method and a recovery period of 27.5 years. See sec. 168(b)(3)(B), (c). This means that AmeriSouth can deduct a portion of Garden House's basis over the course of 27.5 years.[8]

But what is Garden House for purposes of MACRS? AmeriSouth argues that Garden House is not only apartment buildings--which both parties agree are residential rental property--but apartment buildings with over a thousand pieces of tangible personal property that just happen to be attached. This classification, resting on MS's cost-segregation study, posits that these pieces are 5-year and 15-

---

[7] MACRS also provides the applicable "convention" which helps a taxpayer determine when it may start depreciating an asset that was placed into service part way through a tax year. See sec. 168(a), (d). Don't worry about this wrinkle--it's a term of the depreciation equation that's not in dispute.

[8] The depreciation clock for residential rental property begins in the middle of the month it is placed in service. See sec. 168(d)(2).

year property--for which the Code mandates recovery periods of 5 and 15 years,

respectively, and directs the use of declining-balance depreciation methods. See

sec. 168(b) and (c). Declining-balance methods allow taxpayers to take higher

depreciation deductions in the earlier years of an asset's life, which would further

accelerate AmeriSouth's recovery of its costs.[9]

---

[9] In the case of 5-year property, a taxpayer would start by using the double-declining-balance (DDB) method until switching to the straight-line (SL) method would become more advantageous. See sec. 168(b)(1). And then there's the alternative minimum tax, that parallel tax system that applies nearly flat rates but strips out favorable tax deductions and exemptions, which, if applicable, would require a taxpayer to make depreciation adjustments based on the 150-percent-declining-balance (150DB) method. See sec. 56(a)(1).

Consider a simplified example (that ignores some conventions for simplicity's sake): If the 5-year property costs $10,000, the SL method evenly allocates the cost over the five years--$2,000 per year, or 20 percent of the total cost. The 20 percent is the initial SL rate, but when looking at the depreciable *balance*--the cost of the property minus previously deducted depreciation--that rate changes. Thus in the second year, the $2,000 of depreciation is 25 percent of an $8,000 balance ($10,000 cost minus year-one depreciation). A similar calculation yields a 33 percent SL rate in year three; 50 percent in year four; and 100 percent, i.e., the remaining balance, in the final year.

The taxpayer-friendly 150DB and DDB methods take the first-year SL rate of 20 percent and multiply it by a factor of 1.5 and 2 respectively. They then multiply the resulting 30 percent and 40 percent rates by the depreciable balance each year until it becomes more favorable to apply the SL rate in a given year. Thus, in this example, under the 150DB method, the SL rate would apply beginning in year 3.

The Commissioner, on the other hand, argues that all of the property in question is residential rental property. He says the components in question are integral to the apartments' operation and maintenance and should thus be classified as *structural* components, depreciable over the life of the buildings.

But the Commissioner first tries to ride down and tie up a few dogey arguments--claiming that AmeriSouth is trying to depreciate some assets it doesn't even own and some other assets that it does own but that just aren't depreciable. We deal with these first.

I.    AmeriSouth's Depreciable Interests

The Commissioner argues that AmeriSouth doesn't own or bear the replacement risk for the gas, water, and sewer lines, and therefore it isn't entitled to depreciate their cost. He also argues that AmeriSouth's claimed site preparation and earthwork, if it even occurred, relates to the land, and so is not depreciable.

A.    Depreciation of Utility Lines

The Commissioner now asserts that AmeriSouth doesn't own portions of the water-distribution system, sanitary-sewer system, gas line, and underground site electric (which we'll just call the utility lines) and therefore can't depreciate them. The Commissioner makes the same argument regarding the overhead electric

lines. Because the Commissioner has raised these questions for the first time at trial, he bears the burden of proof. See Rule 142(a)(1).

For a taxpayer to depreciate an item, he must bear the loss when that property wears out. See Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 254 (1939). So even if AmeriSouth owns certain property, if someone else repairs or replaces it, AmeriSouth can't properly claim a deduction because it isn't financially hurt by the wear and tear. See Mayerson v. Commissioner, 47 T.C. 340, 350 (1966) ("[D]epreciation is not predicated upon ownership of property but rather upon an investment in property").

The parties provide an abundance of information about what "typically" occurs and who "generally" owns or repairs utility lines but are more reticent with information about who owns or repairs the utility lines Garden House actually uses. AmeriSouth claims that developers typically pay for and install utility lines such as those in this case, and so it should be entitled to depreciate them to recover its predecessor's investment. The Commissioner points to the fact that the lines are located underground within a sanitary sewer easement held by the City of Mesquite and also introduces evidence of a general utility easement which grants all public utilities full right of ingress and egress "for the purpose of constructing, reconstructing, inspecting, patrolling, maintaining and adding to or removing all or

part of its respective systems" on AmeriSouth's property. All of this, the Commissioner claims, proves the underground utility lines do not belong to AmeriSouth. And even if they did belong to AmeriSouth, he argues that AmeriSouth does not bear the loss of its predecessor's investment because the City takes care of repairs and replacement.[10]

1.      Utility-Lines Ownership

We do find that Mesquite holds an easement for "constructing, operating and maintaining a sanitary sewer main" across AmeriSouth's property and that the utility lines are physically within this easement. Though the evidence the parties have produced suggests that public utilities have *the right* to construct and maintain water mains and gas and electric lines, it does not show if that is what actually happened. The Commissioner doesn't provide, nor do we find, any indication that under Texas law an easement holder owns all property found within that easement. Therefore, we cannot find that the mere location of the utility lines within the easement proves that AmeriSouth doesn't own them.

---

[10] While such a result seems harsh, this nondepreciable interest--similar to one in land--will create a tax benefit upon disposition, at which point its tax basis offsets the amount realized. See Wilshire-La Cienega Gardens Co. v. Riddell, 148 F. Supp. 938, 941 (S.D. Cal. 1956).

We do believe, however, that the Commissioner has met his burden with respect to the sanitary-sewer system. For this he demonstrates that Mesquite obtained an easement before the apartments were erected for the specific purpose of installing, operating, and maintaining a sewer system. We find this to be more probative than the simple fact that there was a general utility easement on AmeriSouth's property. While AmeriSouth could rebut that evidence by showing that it owned the sewer main it has not done so; and we thus deem this issue conceded.

Finally, we have to answer the question of whether AmeriSouth owns the overhead electric lines. The Commissioner notes that a survey of AmeriSouth's property states that the overhead electric lines "encroach" on the property, and he deduces the overhead lines must not belong to AmeriSouth because one's own property wouldn't encroach upon itself. This would put a heavy load on a single word, but he also more persuasively points out that AmeriSouth admits that it does not own the transformers that handle the electric load in the lines. These transformers are smack in the middle of those lines. On this somewhat undertried issue, that will have to do: We find it more likely than not that if Mesquite owns the transformers, it also owns the lines entering and exiting the transformers.

2. <u>Responsibility to Repair</u>

Though the Commissioner doesn't satisfy his burden as to the ownership of the water-distribution system, the gas line, and the underground portion of site electric, he alternatively claims that, even if AmeriSouth technically owns the property, it can't take a depreciation deduction because it doesn't pay for repairs. He notes that utility companies have used the access easements for repair work.

We agree with the Commissioner that from the property line to the gas, water, and electric meters, the city or utility companies are responsible for the repair of utility lines--AmeriSouth's manager admitted as much. But since AmeriSouth's responsibility for repair begins once the utility line reaches the gasket/meter on its side of the meter, we must still decide whether the lines between the meters and the buildings are structural components. <u>See</u> <u>infra</u> pp. 37-43.

B. <u>Site Preparation and Earthwork</u>

MS's cost-segregation study allocates $65,381 of Garden House's depreciable basis to "site preparation and earthwork," depreciable over 15 years as a land improvement. The study later refers to the same expenses as "site development," but nowhere describes what work is included in this category. AmeriSouth has submitted an exhibit that claims these expenses relate to "land improvements for excavating, grading, stone bases and compaction needed to construct sidewalks,

parking and driveways," but the Commissioner's expert claims that MS's workpapers show the expenses relate to the initial clearing and grubbing (i.e., tree removal) of the land before the apartments' construction in 1970. The Commissioner also says that AmeriSouth hasn't proven that the claimed improvements to land ever actually happened--for example, the Commissioner notes the land could have been treeless in the first place. And the Commissioner argues that even if the work did happen, clearing and grubbing isn't depreciable because it's not subject to wear and tear and generally makes the land more valuable.

This may overstate the matter a bit. While land generally isn't depreciable, sec. 1.167(a)-2, Income Tax Regs., improvements to land or physical preparations for land development may be depreciable if they are "closely associated with a depreciable asset." Langer v. Commissioner, T.C. Memo. 2008-255, aff'd, 378 Fed. Appx. 598 (8th Cir. 2010); see also Rev. Rul. 65-265, 1965-2 C.B. 52, clarified by Rev. Rul. 68-193, 1968-1 C.B. 79 (costs for earthwork in preparation for buildings or paving roadways are depreciable). If site preparation is "inextricably associated" with the land itself, however, it is not depreciable. Algernon Blair, Inc. v. Commissioner, 29 T.C. 1205, 1221 (1958). Thus the depreciability of site

improvements hinges on whether they relate to a depreciable asset or just to the land itself.

This is a question of fact. And on this question of fact we find for the Commissioner. His determination has a presumption of correctness and AmeriSouth has the burden to overcome that presumption.[11] See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). AmeriSouth also failed to address this issue at trial and failed to file a posttrial brief. The only place AmeriSouth refutes the Commissioner's determination is in an expert report about MS's cost-segregation study, which cites the deposition of Philip Mann, the head of MS. The report limits itself to a description of the assets and legal conclusions.[12] The Commissioner's expert relied on MS's workpapers to prepare his own report. MS created these workpapers contemporaneously with its study, and we find the Commissioner's expert more reliable for relying on them. We note that AmeriSouth failed to put these workpapers into evidence to undermine the

_____

[11] In its petition, AmeriSouth suggests that the burden of proof shifts to the Commissioner. See sec. 7491(a). But under section 7491(a), AmeriSouth has to put forth credible evidence before the burden can shift, and it failed to do so at trial.

[12] The expert, Eric Ernst of Ernst Consulting Group, Inc., states that the "site development" included "clearing, grading and over seeding," but AmeriSouth does not provide supporting facts. Ernst cites the deposition of Philip Mann, the head of MS, but that deposition was never admitted into evidence.

Commissioner's characterization of what they held. We therefore sustain the Commissioner's determination that the costs related to initial clearing and grubbing of the land are nondepreciable.

It's certainly plausible that some of the pre-1970 site preparation relates to sidewalks, parking, and driveways and may therefore be depreciable, but AmeriSouth has presented no evidence on this point. In this context--or lack of context--we cannot uphold AmeriSouth's allocation between the costs of land and site preparation. See Aurora Vill. Shopping Ctr., Inc. v. Commissioner, T.C. Memo. 1970-39. We therefore sustain the Commissioner's determination that the claimed "site preparation and earthwork" is nondepreciable.

## II. Classifying Property

AmeriSouth and the Commissioner don't dispute which recovery period applies to each property class, but instead disagree upon the appropriate classification of various items. The Commissioner claims all of the property in question is part of the apartment buildings and therefore should be classified as residential real property. AmeriSouth argues that many components should be classified as tangible personal property. In analyzing the situation, we find ourselves facing a *llano estacado* with only such ambiguous landmarks as tangled

statutory cross-references (some to repealed sections of the Code), definitions by both example and negation, and extremely fact-specific caselaw to guide us.

A.    Traversing the Code

We set off with the Code.  Section 168(e) defines when a building is residential rental property but does not define with precision what a "building" is. So we look instead for guidance on what "tangible personal property" means.

First, section 168(e) tells us to classify property on the basis of its class life, and section 168(i)(1) sends us to section 167(m), as in effect before its repeal, to determine what that is.[13]  Former section 167(m) gave the Secretary authority to provide guidance on the class lives for each class of property so taxpayers can compute their depreciation expenses.  Every so often the Secretary amends the asset classes and periods that determine class lives and publishes the new ones in a revenue procedure.  See sec. 1.167(a)-11(b)(4)(ii), Income Tax. Regs.

The revenue procedure in effect for the years at issue is Rev. Proc. 87-56, 1987-2 C.B. 674.  The stated purpose of Rev. Proc. 87-56 is "to set forth the class

---

[13] Congress repealed section 167(m) in 1990, see Omnibus Budget Reconciliation Act of 1990 (OBRA), Pub. L. No. 101-508, sec. 11812(a)(1), 104 Stat. at 1388-534, but section 168(i)(1) still incorporates that section's pre-repeal language and treats the taxpayer as if it elected to have that section apply.  Before the repeal, section 167(m) essentially codified the Asset Depreciation Range system found in section 1.167(a)-11, Income Tax Regs.

lives of property that are necessary to compute the depreciation allowances available under section 168 of the Internal Revenue Code."[14]  See Rev. Proc. 87-56, sec. 1, 1987-2 C.B. at 674.  To accomplish this purpose, Rev. Proc. 87-56, sec. 5, 1987-2 C.B. at 675, describes certain classes of property and their recovery periods and lists other asset classes along with their class lives and appropriate recovery periods in a twelve-page table.  If an item doesn't fall within that section or the table (or is not otherwise provided for by statute), then the property is treated as having no class life. Id. sec. 2.04, 1987-2 C.B. at 675.  Rev. Proc. 87-56,  sec. 5.02 reiterates that residential rental property has a recovery period of 27.5 years.

AmeriSouth relies on two classifications within Rev. Proc. 87-56 for its claimed tangible personal property; asset class 00.3 (land improvements, depreciable over 15 years) and asset class 57.0 (distributive trades and services, depreciable over 5 years).[15]  It includes its water-distribution system, sanitary-sewer system, gas lines,

---

[14] Rev. Proc. 87-56, 1987-2 C.B. 674, incorporates and updates many items from Rev. Proc. 83-35, 1983-1 C.B. 745, and replaces that revenue procedure for property subject to section 168.  See Rev. Proc. 87-56, secs. 5.03, 6, 1987-2 C.B. at 675-76.

[15] The use of asset class 57.0 presents a paradox.  Its description--"assets used in wholesale and retail trade, and personal and professional services"--does not seem to describe the property at issue.  But in applying the definition of "5-year property" from a former version of section 168, see sec. 168(c)(2)(B) (as in effect before the Tax Reform Act of 1986 (TRA 1986), Pub. L. No. 99-514, 100 Stat. 2085), we have held that a microwave and range used for rental property are 5-year

(continued...)

and site electric in the former category, placing everything else in the latter.  But

asset class 00.3 excludes "buildings and structural components as defined in section

1.48-1(e) of the regulations."  Id., 1987-2 C.B. at 677.[16]

---

[15](...continued)
property,  Subt v. Commissioner, T.C. Memo. 1991-429.  That superseded language
of former section 168(c)(2)(B) survives in section 1.168-3(c)(2), Proposed Income
Tax Regs., 49 Fed. Reg. 5957 (Feb. 16, 1984), and the IRS has clarified that certain
personal property used in a rental-real-estate activity does fall under asset class
57.0.  See I.R.S. Announcement 99-82, 1999-2 C.B. 244, 244-45 (Aug. 9, 1999)
(updating Form 4562).  With this background in mind, and because AmeriSouth and
the Commissioner stipulate that asset class 57.0 describes AmeriSouth's business,
we won't further poke around at the proper classification of AmeriSouth's tangible
personal property if it turns out not to be residential real property.

[16] Rev. Proc. 87-56 is filled with references to section 1245 property and
section 1250 property.  Section 1245 property includes personal property that is or
was subject to section 167 depreciation.  Sec. 1245(a)(3).  Section 1250 property
includes any real property that is or was subject to section 167 depreciation and that
is not section 1245 property.  Sec. 1250(c).

A look at sections 1245 and 1250,[17] with their accompanying regulations, confirms that section 1.48-1, Income Tax Regs., is our proper destination. Depreciable personal property is section 1245 property. See sec. 1245(a)(3)(A). Section 1245 in turn looks to section 1.48-1(c), Income Tax Regs., see sec. 1.1245-3(b)(1), Income Tax Regs., to define tangible personal property: "Tangible personal property includes all property (*other than structural components*) which is contained in or attached to a building", sec. 1.48-1(c), Income Tax Regs. (emphasis added). Structural components are section 1250 property. See sec. 1.1250-1(e)(3)(i), Income Tax Regs.; sec. 1.1245-3(c), Income Tax Regs.[18] And

---

[17] We can in general ask whether the property in question is section 1245 property or section 1250 property. Under ACRS, section 168 assigns a classification and corresponding recovery period to property based on whether it is "section 1245 class property" or "section 1250 class property." See sec. 168(c) (as in effect before TRA 1986). Section 168 under MACRS no longer uses that language and instead assigns property to recovery periods based on class lives, see sec. 168(c), (e), but the distinction between the two types of property continues to be relevant under MACRS, see Hosp. Corp. of America v. Commissioner, 109 T.C. 21, 54-55 (1997).

[18] Section 1.1245-3(c), Income Tax Regs., refers to a category of section 1245 property coined "other property," which is distinct from "personal property." Nonetheless, for the purpose of defining structural components, section 1.1250-1(e), Income Tax Regs., detours us through that subsection to arrive at the relevant definition.

section 1.48-1(e), Income Tax Regs., provides the relevant definition of structural components.

But upon finally arriving at section 1.48-1, Income Tax Regs., our journey takes a bit of a detour--we have an extant regulation derived from an extinct statutory framework. The regulation is entitled "Definition of section 38 property," referring to *former* section 38,[19] which dealt with the investment tax credit (ITC).[20] As a result, we also look to caselaw interpreting the ITC to determine whether section 1.48-1(e), Income Tax Regs., classifies AmeriSouth's property as structural components for purposes of depreciation. Hosp. Corp. of Am. v. Commissioner, 109 T.C. 21, 54-55 (1997).

---

[19] There is an explanation to the apparent numerical incongruence: Before a 1990 amendment, section 48 defined "section 38 property." See sec. 48 (as in effect before OBRA).

[20] Before its repeal, the ITC allowed taxpayers to recoup a portion of expenses invested in their business, rewarding the taxpayer for capital expenditures on equipment and machinery--seen as a boost to production and thus economic growth--but not for the outlays on the buildings that housed the equipment and machinery. See, e.g., Scott Paper Co. v. Commissioner, 74 T.C. 137, 167-68 (1980).

B.    The Caselaw

Section 1.48-1(e), Income Tax Regs., defines "building" and "structural components."  The Commissioner and AmeriSouth agree that the apartments are buildings but disagree about what a structural component is.  Section 1.48-1(e)(2), Income Tax Regs., says:

> The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components *relating to the operation or maintenance of a building*.  [Emphasis added.]

Thus we ultimately look to see if an item--whether inside or outside the building--relates to the *operation or maintenance of a building* to determine if it's a structural component.[21]  See Scott Paper Co. v. Commissioner, 74 T.C. 137, 183

---

[21] There is an exception.  An item that would otherwise be a structural component will be considered tangible personal property under section 1.48-1, Income Tax Regs., if the sole justification for its installation is "to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs."  Sec. 1.48-1(e)(2), Income Tax Regs.  Neither party argues that this applies to any property in this case.

n.12 (1980). The catchall language in the final phrase modifies the specifically listed items so that even they, in "unusual circumstances," are tangible personal property when not relating to the overall operation or maintenance of a building. Id. at 183.

The cases that have slogged through this operation-or-maintenance-of-a-building morass have left a mess of hoof marks that sometimes makes it hard for us to follow the right trail. And while always acknowledging the caselaw's emphasis on the unique circumstances of each case, we navigate by relying on three prominent landmarks--whether an asset is: (1) accessory to a business, (2) permanent, or (3) "ornamentation".

### 1. Accessory to a Business

One tool in our saddle bag comes from the Senate report accompanying the ITC: "It is intended that *assets accessory to a business* such as grocery store counters, printing presses, individual air-conditioning units, etc., even though fixtures under local law, are to qualify for the [investment tax] credit." S. Rept. No. 87-1881 (1962), 1962-3 C.B. 707, 722 (emphasis added). One context in which courts have largely applied an accessory-to-a-business analysis is when property arguably serves a function specific to a taxpayer's business. See Hosp. Corp., 109 T.C. at 69

(describing certain five-year property); Morrison, Inc. v. Commissioner, T.C. Memo. 1986-129, aff'd, 891 F.2d 857 (11th Cir. 1990). Handrails are thus accessory to a hospital's healthcare-service business when placed in a corridor to aid patients, see Hosp. Corp., 109 T.C. at 83, and outside lights are accessory to a psychiatric facility's business when installed to prevent unwanted departures by patients and to reassure residents in the area about security, see Metro Nat'l Corp. v. Commissioner, T.C. Memo. 1987-38.

Property used directly with specific pieces of equipment may also be accessory to a business[22]--because an item that specifically serves a piece of equipment is not generally serving the building in which that equipment is placed.[23] See, e.g., Hosp. Corp., 109 T.C. at 79 (citing examples of property that "was necessary to and used directly with specific pieces of equipment and consequently did not relate to general building" operations). This analysis came from Scott

---

[22] We classified water piping that was set in the concrete beneath a cafeteria kitchen, for example, as tangible personal property--even though the piping could be adapted for use by other businesses--because it actually served the taxpayer's kitchen equipment and machinery. Morrison, Inc. v. Commissioner, T.C. Memo. 1986-129, aff'd, 891 F.2d 857 (11th Cir. 1990).

[23] Because the property relates to equipment which in turn relates to the taxpayer's business, the property is deemed accessory to a business. See Hosp. Corp., 109 T.C. at 80.

Paper Co. v. Commissioner, 74 T.C. 137 (1980), where we had to decide whether a manufacturer's primary-electric improvements qualified for the investment tax credit. In Scott, we looked to the ultimate use of power, and held that "power used to meet the demand of process machinery is not used in the overall operation or maintenance of a building." See id. at 184.[24]

We have extended the reasoning of Scott to drain, gas, and water lines which serve a restaurant owner's equipment, see Duaine v. Commissioner, T.C. Memo. 1985-39; to water piping that is connected to kitchen machinery and equipment in a cafeteria, see Morrison, T.C. Memo. 1986-129 ("[w]e conclude that the kitchen water piping is necessary to and is used directly with specific pieces of * * * equipment"); and to electrical wiring, outlet receptacles, and other property which power television sets in a hospital, see Hosp. Corp., 109 T.C. at 31, 68, 71. If, in contrast, a component is connected not with specific equipment but with a structural component of a building, we are likely to classify it as part of that building. See Metro, T.C. Memo. 1987-38 (toilet partitions had clear relation to

---

[24] If the item serves both the taxpayer's equipment and the building generally, e.g., electric wiring, taxpayers may accelerate depreciation of an item to the extent equipment usage makes up total usage. See, e.g., Hosp. Corp., 109 T.C. at 63-64.

plumbing facilities); <u>see also</u> <u>Hosp. Corp.</u>, 109 T.C. at 68 ("disputed property item constitutes a structural component to the extent that it furnishes electrical power for a function or equipment that relates to the operation or maintenance of a building"); <u>Samis v. Commissioner</u>, 76 T.C. 609, 618 (1981).

2.      <u>Permanence</u>

We also have to evaluate the permanence of the component.  Although permanence is not always an overriding factor, <u>see</u> <u>Hosp. Corp.</u>, 109 T.C. at 68 ("that some of the wiring and conduit is contained in the walls and floors of the hospitals is not relevant in determining whether those items are personal property"); <u>Morrison</u>, T.C. Memo. 1986-129 (kitchen water piping--tangible personal property-- was set in concrete), we have considered it in the accessory-to-a-business context. <u>See</u> <u>Metro</u>, T.C. Memo. 1987-38 (finding that cabinets used for tenants' business needs, which could be easily moved, qualified as tangible personal property).  Of course, permanence is also a key factor for items that do not serve a function unique to a taxpayer's business--such as carpet and wall and floor coverings.  <u>See</u> <u>Hosp. Corp.</u> 109 T.C. at 73-78; <u>see also</u> S. Rept. No. 95-1263, at 117 (1978), 1978-3 C.B. (Vol. 1) 321, 415.

But nothing human lasts forever, moving us to ask how permanent must a component be to have "permanence"?  Our cynosure is Whiteco Indus., Inc. v. Commissioner, 65 T.C. 664 (1975).  In Whiteco, we considered six factors:

- whether the property is capable of being moved and whether it had in fact been moved;

- whether the property is designed or constructed to remain permanently in place;

- whether there are circumstances which tend to show that the property may or will have to be moved;

- whether removal of the property would be a substantial and time-consuming job;

- the damage the property would sustain upon removal; and

- the manner of "affixation" of the property to the land.

Id. at 672-73.

Cases after Whiteco have finessed its basic structure.  The ease and frequency of moving the item in question helps determine its permanence, see, e.g., Hosp. Corp., 109 T.C. at 57, 74, but movability is not a controlling factor.  Metro, T.C. Memo. 1987-38 (noting that some of the examples of structural components in the regulation are readily removable).  Other indicia include the function and design of the component, the intent of the taxpayer in installing the component, the

effect of the component's removal on the building, and the extent the component can be reused after removal.  Consol. Freightways, Inc. v. Commissioner, 708 F.2d 1385, 1390 (9th Cir. 1983) (citing Whiteco, 65 T.C. at 672-73), aff'g in part, rev'g in part 74 T.C. 768 (1980); Mallinckrodt, Inc. v. Commissioner, T.C. Memo. 1984-532, aff'd, 778 F.2d 402 (8th Cir. 1985).

   3.  Ornamentation

Because AmeriSouth also argues that several items serve as decoration, we note an additional consideration listed in S. Rept. No. 95-1263, at 117 (1978), 1978-3 C.B. (Vol. 1) at 415:  "[T]angible personal property * * * includes special lighting * * *, false balconies and other exterior ornamentation that have no more than an incidental relationship to the operation or maintenance of a building."  Thus lights serving to accentuate the shrubbery outside of a building qualify as tangible personal property, falling "squarely within the language of S. Rept. 95-1263."  Metro, T.C. Memo. 1987-38; see also Morrison, T.C. Memo. 1986-129 (deciding, after considering various factors, that the taxpayer's lattice millwork served as decorative ornamentation and thus was tangible personal property).

And there remains one more tangle of brush that we still need to clear.  A major part of the parties' disagreement is about the appropriate benchmark for

Garden House—do we compare it to an apartment building or a more generic building? In other words, should the Court look to see if the items in question relate to the structure, maintenance, or operation of a typical apartment building, or to the structure, maintenance, or operation of a generic shell building?

### C. Defining AmeriSouth's Building

AmeriSouth argues that Garden House should be compared to a "shell" building when we decide what is necessary for its operation and maintenance (or in other words, when we determine what is a structural component). In AmeriSouth's view, the only items that are structural components are those that are necessary to provide general lighting, heating, cooling, and electricity to a nondescript building. The Commissioner on the other hand argues that the rule is more specific. He says Garden House should be compared to a typical apartment building, and therefore anything that is typical of an apartment building should be a structural component.

Like all the other factors that the parties point at to guide our way, the definition of a building has been a factor, but not necessarily a deciding factor, in other cases. See, e.g., Morrison, T.C. Memo. 1986-129 (finding restroom "accessories serve[d] no function particularly unique to a cafeteria"). Perhaps what makes it so inviting for the parties to put this issue under the microscope in this case

is the context: residential real property, which rarely would have qualified for the old ITC. In contrast to commercial buildings, which can house many different types of businesses, residential real property contains but one: Providing lodging and accessories to tenants. If "typicality" governs, one would be hard pressed to find any "unique" components in a rental apartment building.

We nevertheless think that AmeriSouth is wrong to argue that we should use a barebones building as our base line.[25] Section 1.48-1(e)(2), Income Tax Regs., explicitly lists items that are not common to all buildings--e.g., stairs, escalators, elevators, and bathtubs. We read this as the regulation's telling us to take into account the type of building that the components are part of.[26] See, e.g., Metro, T.C. Memo. 1987-38 ("[W]e are looking at the structure of the building, ascertaining the components relating to the operation and maintenance of a building *as rental space*." (Emphasis added.)).

---

[25] We note that several of Rev. Proc. 87-56's predecessors used the word "shell" to describe a building, see Rev. Proc. 72-10, 1972-1 C.B. 721, 730; Rev. Proc. 62-21, 1962-2 C.B. 418, 419, but even assuming that modifier sheds light on the area, it still begs the question whether we look at the shell of a generic building or the shell of an apartment building.

[26] In defining "building", the regulation also notes various building purposes. Sec. 1.48-1(e)(1), Income Tax Regs.

So we will start by asking whether a component relates to the operation or maintenance of an *apartment* building, but we can't stop there. Though AmeriSouth would find it difficult to argue that any of the contested components is unique to its business, AmeriSouth might be able to show that some components are not permanent, see, e.g., Hosp. Corp., 109 T.C. at 88 (seeing nothing unique about bathroom accessories but still applying a permanency analysis to determine whether they are structural components), or that they serve specific items of equipment rather than the building generally, see Morrison, 891 F.2d at 863 ("Components of primary electrical systems that supply electricity to the overall operation or maintenance of a cafeteria building do not qualify for the investment tax credit," but components "that distribute electricity to non-structural components of [the taxpayer's] business [do].").

We now have at least a rough map to guide us in exploring AmeriSouth's depreciation claims, which we look at in the same order the parties used.

IV.    Depreciable Lives

A.    Water-Distribution System

The Commissioner and AmeriSouth calculate the water-distribution-system's depreciation differently:

| Year | Per IRS | Per AmeriSouth |
|-------|---------|----------------|
| 2003 | $3,556 | $6,176 |
| 2004 | 4,491 | 11,734 |
| 2005 | 4,491 | 10,560 |
| Total | 12,538 | 28,470 |

AmeriSouth's water-distribution system includes the water and fire lines, fire hydrants, and "trenching and backfill." AmeriSouth describes trenching and backfill as (1) excavating soil where the utility will lay water lines, (2) testing the soil and ensuring it's suitable, (3) laying the lines, and then (4) replacing the excavated soil.[27] It argues that the lines running from the municipal water main to the buildings are tangible personal property with a recovery period of 15 years.[28] The Commissioner to the extent AmeriSouth owns the water-distribution system, it's a

---

[27] "Trenching and backfill" also affects depreciation of the sanitary-sewer system, the gas line, and site electric because builders install those components in ways very similar to the way they install a water-distribution system.

[28] Only a portion of the lines is still at issue. The water-distribution system, along with the sanitary-sewer system and gas-line categories, includes lines that run from an off-site source to meters on the property, and then from the meters to the building. Because we have already decided AmeriSouth does not own the lines until they reach the meters, it can depreciate the lines only to the extent they run from the meters to the buildings. How fast it can depreciate these lines is the issue we decide.

structural component of the buildings and therefore depreciable only over 27.5 years.

It is clear to us that the water-distribution system is an integral part of the buildings's plumbing and air-conditioning systems and also serves the building generally by providing potable water. See Samis, 76 T.C. at 618. Thus AmeriSouth's argument that the water-distribution system could service the land appears to hinge solely on the fact that it is *outside* the building. But that fact does not affect our finding that the components relate to the operation and maintenance of the apartments. See Scott, 74 T.C. at 183 n.12 ("Property can relate to the overall operation and maintenance of a building, even though it is not located within the building"). Accordingly, AmeriSouth must depreciate the water-distribution system's components over the life of the apartment buildings.

B.    Sanitary-Sewer System

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|---|---|---|
| 2003 | $2,699 | $4,688 |
| 2004 | 3,409 | 8,906 |
| 2005 | 3,409 | 8,016 |
| Total | 9,517 | 21,610 |

The sanitary-sewer system includes sewer lines extending from the buildings to the municipal sewer, sewer manholes, and the trenching and backfill for those lines. We have already found that AmeriSouth can't depreciate the sanitary-sewer system, but we also find that AmeriSouth fails to distinguish these components from those of the water-distribution system. AmeriSouth's trial witness states a general purpose for the system--"[a]ll your drains, everything inside the building goes in the sanitary system." Because the system serves the building generally, even if it were owned by AmeriSouth, it would be part of the buildings.

C.    Gas Line

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|---|---|---|
| 2003 | $1,356 | $2,354 |
| 2004 | 1,712 | 4,473 |
| 2005 | 1,712 | 4,026 |
| Total | 4,780 | 10,853 |

The gas lines are similar. Under the "gas line" category, AmeriSouth includes both gas lines that extend from the utility source to the buildings and the cost of trenching and backfill. These gas lines do not materially differ from the other utilities. The only additional argument we glean from the record is that if the

building had commercial use, it might not need the gas line. But as we have previously found, the correct analysis is whether the gas line relates to the operation or maintenance of an *apartment* building. Accordingly, the items under this category are structural components of the building, and AmeriSouth must recover the costs over the life of the apartment buildings.

### D. Site Electric

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|---|---|---|
| 2003 | $5,478 | $9,514 |
| 2004 | 6,918 | 18,076 |
| 2005 | 6,918 | 16,268 |
| Total | 19,314 | 43,858 |

The site electric involves lines--both underground lines (primary and secondary conduit and wire) and overhead electric service--as well as trenching and backfill. AmeriSouth also includes wall packs (exterior lighting) in this category.

Because AmeriSouth puts forward the same arguments for the underground lines, which include the trenching and backfill, as it has for the utilities we have already discussed, the underground lines meet the same fate--we find that they are structural components of the buildings. And since we have resolved the ownership

of the overhead electric service issue in favor of the Commissioner, we concentrate our efforts on the wall packs.

The wall packs illuminate the exterior of the apartments for the convenience and safety of the tenants. Beyond this general purpose, AmeriSouth provides no other evidence that the wall packs are specialized lighting, see Metro, T.C. Memo. 1987-38, or are otherwise not structural components of the building. We find for the Commissioner.

E.    Special HVAC

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|------|------|------|
| 2003 | $548 | $3,809 |
| 2004 | 692 | 6,094 |
| 2005 | 692 | 3,656 |
| Total | 1,932 | 13,559 |

The venting connected to the stove hoods and the venting connected to clothes dryers in the apartments make up Special HVAC.[29] AmeriSouth has units with washer and dryer connections for tenant use and seven common laundry rooms with

---

[29] AmeriSouth referred to the stove hoods as "microwave hoods," but at trial we learned that the apartments had no microwave hoods.

washers and dryers operated by Coinmach. The clothes-dryer vents are four-inch metal pipes that extend from the back of the clothes dryers to the outside of the buildings. The venting that extends from the stove hoods pulls smoke, humidity, and hot air out of the kitchens.

The clothes-dryer vents serve specific equipment--the dryers. See Morrison, T.C. Memo. 1986-129 (finding that kitchen water piping served equipment and was not general building plumbing). The vents expel hot air and carbon monoxide and reduce humidity. These vents extend directly from the dryers to the outside of the building and have no connection to the apartments' general ventilation system. The Commissioner argues that the clothes-dryer venting serves the function of ventilating the apartments. But he has failed to show how the venting services the apartments generally apart from the clothes dryers. Therefore, we find for AmeriSouth.[30]

---

[30] AmeriSouth has few electric dryers (though tenants can rent them) and does not own any gas dryers--Coinmach does. The Commissioner did not concern himself on brief with ownership of the dryers (ownership of clothes washers and dryers came up only with allocating "rough-in" costs), but we do. While nonownership, and lack of use, may be evidence that components are used only for general building operation, in this case it's a distinction without a difference. See Samis v. Commissioner, 76 T.C. 609, 620 n.6 (1981) (ownership was irrelevant in light of congressional intent). We find that the vents are designed for the use of

(continued...)

We are, however, not convinced that the vent hoods above AmeriSouth's stoves are tangible personal property. Although they serve equipment--AmeriSouth's kitchen ovens--we are not convinced that they serve only the stoves. AmeriSouth contends that the vents remove both heat and smells. The Commissioner counters that these odors and heat can come from beyond the stovetop, and we agree. AmeriSouth does little to rebut the Commissioner's argument, and so we find that the hoods are structural components of the buildings and must be depreciated over 27.5 years. See Morrison, T.C. Memo. 1986-129 ("[W]ithout consideration of the 'sole justification' test the kitchen air makeup unit would constitute a structural component").

F.    Special Plumbing

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
| --- | --- | --- |
| 2003 | $6,976 | $48,462 |
| 2004 | 8,810 | 77,539 |
| 2005 | 8,810 | 46,524 |
| Total | 24,596 | 172,525 |

---

[30](...continued)
the dryers and serve no other purpose.

AmeriSouth also claims accelerated depreciation for what it terms "special plumbing." Special plumbing consists of sinks, garbage disposals, waste-and-rough-water piping connected to dishwashers and clothes washers, floor drains as well as the waste lines running from the floor drains, and laundry-room gas lines.

### 1.    Sinks

We first look into AmeriSouth's sinks--the kitchen sinks and the plastic utility sink in the office building.[31] AmeriSouth concentrates most of its persuasive efforts on the permanence of the sinks. AmeriSouth argues that the sinks are easy to remove--disconnect the sink from the water lines and remove approximately four screws or clamps--and uses the 2003 apartment renovations as an example.

But section 1.48-1(e)(2), Income Tax Regs., specifically lists sinks as structural components ("'structural components' includes * * * plumbing fixtures, such as sinks and bathtubs"). And while AmeriSouth tags this type of plumbing with the epithet "special", providing water for the kitchen is hardly unusual in the sense of Scott and

---

[31] AmeriSouth factors in the location of an apartment sink to determine depreciable life. AmeriSouth's expert states that "bathroom[ ] [sinks] are considered by the IRS as being a part of a normal function of a building, and kitchen sinks typically are not considered a normal function of a building." Apparently from AmeriSouth's perspective, "this comes back to experience of working with the IRS. You can't be so greedy that you take everything."

later cases, and AmeriSouth fails to give any other evidence that it periodically replaced or even planned to replace sinks after the 2003 renovation. So we find the sinks are also structural components of the buildings and not depreciable apart from them.[32]

    2.    Piping

As for the garbage disposals, AmeriSouth claimed depreciation for them as 5-year property, and the Commissioner did not adjust their depreciation. This leaves waste-and-rough-water piping. In the kitchens, the waste piping connects to the garbage disposals and carries away the water and waste coming from kitchen sinks. The rough-water piping is fittings that connect the straight pipes coming from the wall to the sinks. Because we have already decided that the sinks are structural components, we also find drain pipes to be integral parts of the buildings' plumbing, and thus are also structural components. See Hosp. Corp., 109 T.C. at 68.[33]

---

[32] AmeriSouth also argues that sinks are not needed in a generic building, contrasting its buildings with office buildings. We have already dispensed with this argument by holding that we look at the operation and maintenance of an *apartment* building.

[33] Apart from the general description in MS's cost-segregation study, AmeriSouth does not provide a clear picture of any other piping that extends from the dishwasher. It made no argument peculiar to dishwasher piping at trial, nor did

(continued...)

AmeriSouth also claims it has waste-and-rough-water piping for clothes washers in individual apartments and the shared laundry rooms. The record does not clarify whether this category deals only with components visible from the apartment side of the wall or whether pipes behind the wall (or some part of them) are also included. The inspection and testimony of the Commissioner's expert provide useful information. The term "rough" or "rough-in" refers to installing the plumbing fittings (e.g., water and drain lines) that connect a specific component, such as a sink or other plumbing fixture, to a building's plumbing lines. AmeriSouth, however, provides no evidence that the piping in question runs from where clothes washers are connected to the building's plumbing lines in the wall. See Des Moines Cold Storage Co. v. Commissioner, T.C. Memo. 1988-241 n.6 ("Since petitioner has the burden of proof, it must suffer the consequences of an inadequate record"). We find for the Commissioner.

---

[33](...continued)
it file a posttrial brief. We find that it has thus conceded any additional issues in this category. See, e.g., Lunsford v. Commissioner, 117 T.C. 183, 187 n.6 (2001).

3.        Laundry-Room Drain, Gas-Line, and Waste Lines

In AmeriSouth's seven shared laundry rooms, there are gas lines which run from the primary gas lines to clothes dryers. There are also drains and waste lines which run from the drains to pipe water out. The parties agree that the purpose of the drains is to prevent a flood from spreading throughout the building if a pipe leading to the clothes washers breaks.

For AmeriSouth, this category is a wash. We do not agree with the Commissioner that the gas lines in question are part of the buildings' general plumbing systems. These secondary lines do not supply gas to the building generally; they supply it only to the dryers. See Duaine, T.C. Memo. 1985-39 ("[G]as connectors from the building's main gas line service the restaurant's cooking elements" and "do not relate to general building services").

But AmeriSouth does not persuade us that the drains, and waste lines connected to the drains, are similar. Unlike the dedicated gas lines, they're a permanent part of the building, and AmeriSouth does not argue otherwise. And unlike some of the components we look at, the drains do not appear to be necessary for the effective operation of equipment. See Morrison, T.C. Memo. 1986-129 (finding that drains in the kitchen did not relate to the general drainage of waste

from the cafeteria building where they drained wastes resulting from food preparation activities and serviced specific equipment). The stated purpose is to protect the apartments, not the washers and dryers, so we find for the Commissioner on these components.

G.    Special Electric

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|---|---|---|
| 2003 | $6,689 | $46,468 |
| 2004 | 8,448 | 74,349 |
| 2005 | 8,448 | 44,610 |
| Total | 23,585 | 165,427 |

AmeriSouth's most detailed category is special electric. It begins where site electric ends--with the main panels connected to the outside lines--and comprises some internal wiring and the assets that are connected to the internal wiring, such as light switches, outlets, and paddle fans. AmeriSouth claimed accelerated depreciation for components in both its apartments and its office:

| Office | Apartments |
|---|---|
| Paddle fans<br>Sign flood light<br>Recessed lights<br>Spot lights<br>Closed circuit surveillance, camera,<br> and monitor<br>Sliding-gate components<br>Outlets<br>Electric panel<br>Timers (irrigation and wallpacks) | Outlets<br>Door bells<br>Paddle fans<br>Dining chandeliers<br>Light switches<br>Wiring<br>Main and unit electric panels<br>Timers (irrigation and wallpacks) |

AmeriSouth's wish list is long, but its supporting evidence is limited. We can extinguish its argument about recessed lights, referred to as "decorative", and spot lights, which are presumably for security. AmeriSouth did not provide evidence of how the lights serve a decorative or security purpose, see Metro, T.C. Memo. 1987-38, so we find they are structural components. AmeriSouth also fails to show how its door bells are anything but permanent components of the building. Finally, we have already found the wallpacks to be structural components of the building, and AmeriSouth does not show that their timers are other than integral to operation of these structural components. That makes these assets structural components too.

The Commissioner concedes that the gate components are land improvements, depreciable over 15 years, as are the duplex outlet and timer relating

to the watering of the grounds. The parties also agree that the surveillance components--consisting of a camera and TV--as well as the sign flood light and accompanying timer, are tangible personal property. That still leaves us with several items to consider.

### 1. Paddle Fans and Light Fixtures

Although the dining areas of the apartments are similar in layout, some have the bonus of not only a paddle fan but an attached light fixture.[34] Because the others do not, the lighting provided by these combination light-fans arguably serves to provide ambiance and only incidentally serves as general lighting. See Morrison, T.C. Memo. 1986-129 (finding chandeliers were purely decorative and not a major source of light). But AmeriSouth failed to provide evidence on that point at trial.[35] Nor does it argue that the fans were primarily decorative. Although these components can be moved during a remodeling, AmeriSouth does not provide evidence of actual or

---

[34] MS's cost-segregation study refers to the light fixtures attached to paddle fans as dining chandeliers.

[35] And the direct testimony of AmeriSouth's cost-segregation-study expert that "[t]he light fixture itself is used for general illumination in that space" even serves to undermine it.

planned systematic replacement.[36]  See Shoney's S., Inc. v. Commissioner, T.C. Memo. 1984-413 (finding, along with other factors, that the average five-to-seven-year replacement of chandeliers was evidence they were not structural components). Simply arguing these assets are not part of the building without pointing out why is not enough.  We find for the Commissioner.

2.  Outlets

Although AmeriSouth refers to the outlets in this category as "specialized", there doesn't seem to be anything special about them.  AmeriSouth argues that these outlets are necessary to operate personal property; but that does nothing to distinguish the "special" outlets from any other outlet in the apartments or office.  The fact alone that a copier, treadmill, toaster, or other item of personal property happens to be plugged into a specific outlet in no way indicates that the outlet is for that specific use rather than the general operation or maintenance of the building.  See Hosp. Corp., 109 T.C. at 70-71.  We thus agree with the Commissioner that the countertop outlets and the outlets that a treadmill, copier, and cycle might plug into are structural components.

_____

[36] At trial, AmeriSouth elicited testimony that landlords typically replace chandeliers whenever they remodel a building.  The testimony did not give specifics for AmeriSouth's buildings or, for that matter, any other buildings.

On the other hand, we find that duplex outlets that are four-feet above the ground in kitchen areas clearly accommodate refrigerators, which are personal property. The layout of the kitchens and the location of these outlets leave little doubt they are specifically for refrigerators. See Hosp. Corp., 109 T.C. at 31, 71 (outlet receptacles used for televisions in hospital rooms are personal property). The same is true with respect to the 220-volt outlets in kitchen areas that are used solely for powering stoves and the outlets in laundry areas for washers and dryers. Similarly, the cable, telephone, and data outlets are used for items that are not structural components, so they are considered part of those items. See id. at 72 (phone jacks are used with telephone equipment and thus are considered personal property).

The Commissioner doesn't refute our holding in Hospital Corp., nor does he attempt to distinguish it. He instead argues that "electric wiring" is listed in the regulation. He's right. And we also agree that AmeriSouth doesn't provide evidence that these components are not permanent. But the regulation emphasizes the relationship of a component to the operation or maintenance of a building, and in unusual circumstances--when that item relates to a specific piece of equipment--it is

not a structural component.  See, e.g., Hosp. Corp., 109 T.C. at 64-72; Scott, 74 T.C. at 183.  On these components we find for AmeriSouth.[37]

### 3.    Wiring

The parties stipulate that the wiring in question runs from a unit panel in each apartment to outlets near kitchen garbage disposals, dishwashers, and the hoodver the stove.[38]  AmeriSouth has the burden to produce evidence that this wiring supplied power for the specific personal property claimed, and the evidence we do have is unclear:  AmeriSouth's expert described the wiring as a hard or direct connection to the personal property, but other evidence showed that the wiring in question runs through the wall cavities to outlets these pieces of property plug into.  And if the latter situation's the case, the Commissioner's expert stated it's possible that the wiring connects to other outlets.  Since AmeriSouth never showed that the wiring supplied power for these specific components and not the apartments generally, we find for the

---

[37] The Commissioner does not present evidence of how these components, clearly in use for specific property, could be adapted for general uses.  We therefore do not need to decide to what extent the reasoning of A.C. Monk & Co. v. United States, 686 F.2d 1058 (4th Cir. 1982), might apply.

[38] AmeriSouth's expert described a microwave hood, but again, that's blowing smoke--there are no microwave hoods in the apartments, only stove hoods.

- 55 -

Commissioner.  See Des Moines Cold Storage, T.C. Memo. 1988-241 (the taxpayer did not submit evidence other than self-serving testimony that wiring supplied power for particular system rather than contributing to the overall operation or maintenance of the property).

> 4.     Electric Panels

AmeriSouth claims that it should have a shorter recovery period for a part of the main and unit electric panels in the buildings, because some percentage of electricity flowing through those panels is used for personal property.  In Scott, we allowed an allocation, see Scott, 74 T.C. at 185-87, but later caselaw has been much stingier, see A.C. Monk & Co. v. United States, 686 F.2d 1058, 1064-66 (4th Cir. 1982) (saying better approach is to determine whether an electrical system has more general uses than simply operating specific pieces of machinery).  We do not need to decide whether allocation is appropriate in this case because we find that AmeriSouth has failed to reliably substantiate its allocation of the costs of the electric load between specific equipment and the overall requirements of the building.  See Des Moines Cold Storage, T.C. Memo. 1988-241.  The problem here is that the electric panels have faulty or missing labels.  And AmeriSouth, instead of testing the units, just extrapolates from bad data on some of the units to come up with an

allocation for all the panels in all the buildings. We therefore find that it must depreciate the panels over the life of the apartments.

H.    Finish Carpentry

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|---|---|---|
| 2003 | $5,992 | $41,629 |
| 2004 | 7,568 | 66,606 |
| 2005 | 7,568 | 39,964 |
| Total | 21,128 | 148,199 |

Finish carpentry comprises the shelving in pantry closets and in the living-room-wall recesses, the shelving in the office building, wood-base, crown molding, chair rails, wood paneling, and closet rods.

AmeriSouth does not argue that these items are accessory to its business but does argue that the shelves and closet rods are readily removable without doing any damage to the walls. It also argues that the molding and paneling enhance the apartments' decor and are therefore not mere structural components.

The Commissioner does not dispute that these items are movable, but tells us to focus on other signs of their permanence: The design of the buildings, particularly the wall recesses in the living rooms, accommodates permanent shelving; the shelves

allow for storage, a necessity in an apartment building; and the paneling, molding, and chair rails protect other parts of the buildings, such as the floors, walls, and ceilings, from damage.

We agree with the Commissioner. Though the shelves and closet rods are moveable, movability is not the only sign an asset lacks permanence. See, e.g., Consol. Freightways, 708 F.2d at 1390. AmeriSouth fails to show that it actually moved or planned to remove and reuse the shelves or closet rods, see Hosp. Corp., 109 T.C. at 88, and doesn't point to any other indication of nonpermanence. We therefore find that these items are also structural components of the buildings.

We also conclude that the paneling, molding, and chair rails are structural components of the buildings. Paneling is specifically mentioned in the regulations. See sec. 1.48-1(e)(2), Income Tax Regs. ("the term 'structural components' includes * * * permanent coverings * * * such as paneling"). And although these items are also decorative, they are not items that "fall squarely" within the language of S. Rept. No. 95-1263 explaining what constitutes tangible personal property. See Metro, T.C. Memo. 1987-38 (security lights, grow lights, and decorative lighting are "special lighting," which falls within language of report); Morrison, T.C. Memo. 1986-129 (lattice millwork fell within "removable partition" language of report).

I.    Millwork

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|------|------|------|
| 2003 | $16,860 | $117,121 |
| 2004 | 21,293 | 187,393 |
| 2005 | 21,293 | 112,436 |
| Total | 59,446 | 416,950 |

AmeriSouth's millwork consists of cabinets and countertops. Their proper classification is strictly an issue of their permanence--AmeriSouth argues that they are all removable. But, as with finish carpentry, AmeriSouth did not present any evidence about the additional factors regarding their permanence that we need to consider. We therefore make the same finding as we do on finish carpentry: The millwork is a structural component.

J.    Interior Windows and Mirrors

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|------|------|------|
| 2003 | $1,389 | $9,651 |
| 2004 | 1,755 | 15,442 |
| 2005 | 1,755 | 9,265 |
| Total | 4,899 | 34,358 |

This penultimate category includes the office's interior windows, as well as the mirrors found on the walls of all the apartments' dining rooms, and the mirrors found in all the apartments' bathrooms. In his report, AmeriSouth's cost-segregation expert states that an interior window "is not an asset we would normally treat as 1245 property unless the wall itself was demountable or the window served another unique function." But AmeriSouth presents no evidence of removable walls or the uniqueness of the windows. We find the windows to be structural components.

AmeriSouth's former attorneys also reflected little on the mirrors during trial. They tried to get testimony of the mirrors' decorative function from an adverse witness, but AmeriSouth's own witness stated the dining-room mirrors had "no function." The mirrors are removable, but we see no other evidence that these mirrors are not permanent. See Hosp. Corp., 109 T.C. at 88. We believe AmeriSouth intends the mirrors to stay where they are, and so we find that the mirrors are part of the building.

K.    Special Painting

| Year | Depreciation per IRS | Depreciation per AmeriSouth |
|---|---|---|
| 2003 | $861 | $5,983 |
| 2004 | 1,088 | 9,573 |
| 2005 | 1,088 | 5,744 |
| Total | 3,037 | 21,300 |

AmeriSouth considers the paint on shelves, wood base, chair rails, closet rods, and crown molding as special: special because AmeriSouth considers the assets that the paint covers to be section 1245 property.  AmeriSouth's former attorneys asked at trial whether the classification of the paint should follow that of the items painted, and the Commissioner's witness responded yes.  We see no reason to coat that succinct view with any additional analysis--those items are structural components and, therefore, so is the paint.

Conclusion

We have reached the end of the trail.  Most of the Commissioner's arguments have survived, but a few were lost along the way and therefore

Decision will be entered

under Rule 155.